Calvin Westley SETTLE, Plaintiff,

v.

BALTIMORE COUNTY, Maryland, Michael Darrell Gambrill, Ronald Earp, Minda Foxwell, Howard Hall and Mary K. Ward, Defendants.

Keith Harris, Plaintiff,

v.

Baltimore County, Maryland, Michael Darrell Gambrill, Ronald Earp, Minda Foxwell and Paul Franzoni, Defendants.

Civil Nos. AMD 97–651, AMD 96–2850.

United States District Court,
D. Maryland.

Jan. 20, 1999.

---

2. The remaining complaints charged leaving the City while on duty, failure to abide by orders and law and theft.

972

973

Gary Howard Simpson, Bethesda, MD, for Calvin Westley Settle.

Rebecca N. Strandberg, Bethesda, MD, for Keith Harris.

Virginia W. Barnhart, County Attorney, and Paul M. Mayhew, Asst. County Atty., Towson, MD, for Defendants.

## OPINION

DAVIS, District Judge.

**OPINION SUMMARY:** None of plaintiffs' claims survive summary judgment. Despite the sheer multitude of allegations, plaintiffs are unable to produce a scintilla of direct evidence of intentional racial discrimination or retaliation. Thus, all of plaintiffs' intentional racial discrimination and retaliation claims must satisfy the well-known burden-shifting proof paradigm common to federal employment discrimination jurisprudence. With few exceptions, plaintiffs are unable to establish a prima facie case of intentional racial discrimination or retaliation.

At virtually every turn, the record shows that any inference of intentional racial discrimination or retaliation is fatally undercut by facts demonstrating either or both that (1) non-African American officers and officers who have not filed discrimination charges are subjected to the same alleged "employment injuries" as are plaintiffs, and (2) other African American officers enjoy the full range of benefits and privileges of employment as do non-African Americans. Moreover, even in those few instances in which a prima facie case is otherwise established, plaintiffs either (1) suffered no cognizable "employment injury" under Fourth Circuit case law, (2) failed to rebut defendants' showing of legitimate, non-discriminatory reasons for the disputed acts, or (3) failed to support with admissible evidence, non-conclusory factual allegations sufficient to sustain their burden to show that race (or retaliation) was the true motivation for any of defendants' acts. Consequently, notwithstanding plaintiffs' sincerely held subjective beliefs that defendants targeted them for disparate treatment, a dispassionate and objective analysis of the summary judgment record, consonant with controlling legal principles, refutes their beliefs as a matter of law.

Plaintiffs' hostile work environment claims fare no better than their intentional racial discrimination and retaliation claims. With but one exception, the acts and omissions plaintiffs point to as constituting abusive and harassing conduct tending to create a racially hostile work environment have no racial nexus whatsoever. As a matter of law, moreover, the facially neutral acts plaintiffs find subjectively unwelcome and hurtful are (1) the normal incidents of supervision (and supervision—even aggressive and unfriendly supervision—does not equate to harassment), or (2) viewed objectively, as they must be, acts which are episodic and sporadic in character so as not to support a rational inference that a reasonable member of plaintiffs' protected class would find his or her workplace environment so abusive as to alter the terms and conditions of employment or interfere with one's ability to perform the duties of a police officer.

Accordingly, defendants are entitled to summary judgment on all claims.

## Contents

I. INTRODUCTION ............................................... 975

II. UNDISPUTED FACTS ESTABLISHED IN THE SUMMARY JUDGMENT
 RECORD .................................................. 976

III. SUMMARY JUDGMENT STANDARDS ................................... 983

IV. LEGAL STANDARDS APPLICABLE TO PLAINTIFFS' CLAIMS ............. 984
 A. TITLE VII AND 42 U.S.C. § 1981 ........................ 984
 1. Preliminary Observations ........................... 984
 a. *No Cognizable Pattern and Practice Claims Are Before the Court* ..... 986
 b. *Plaintiffs' Statistical Evidence Lacks Probative Value and is
 Inadmissible* ..................................... 986
 c. *Many of the Plaintiffs' Allegations Do Not Constitute Material
 Adverse Employment Actions and Are Therefore Not Cogniza-
 ble* .............................................. 987

 d. *Defendants' Violations of Department Regulations Are Neither Independently Cognizable Nor Substantially Probative* ............989
 2. Disparate Treatment/Discrete Act ...................................990
 a. *Disparate Discipline* ..........................................991
 b. *Disparate Investigations for the Purpose of Imposing Discipline*.....992
 3. Disparate Treatment/Hostile Environment ............................993
 4. Retaliation.....................................................994
 5. Retaliatory Harassment ..........................................994
 B. HARRIS'S CONSTITUTIONAL CLAIMS ..............................994
 1. First Amendment Claims .........................................994
 2. Equal Protection Claims .........................................995

V. APPLICATION OF LAW TO THE UNDISPUTED FACTS ....................995
 A. DISPARATE TREATMENT CLAIMS ................................995
 1. Discipline and Disciplinary Investigations .........................996
 a. *Settle* .......................................................996
 b. *Harris*.......................................................996
 c. *Settle and Harris* ............................................998
 2. Training Opportunities ..........................................999
 3. Scheduling Days Off ...........................................1001
 B. HOSTILE ENVIRONMENT CLAIMS ...............................1003
 1. The "noose".....................................................1004
 2. AVL Monitoring ...............................................1005
 3. Damage to Harris's "Post Car" ...................................1005
 4. Threatened Removal of Settle from his "Post Car" .....................1005
 C. RETALIATION CLAIMS .........................................1006
 1. Traditional Retaliation .........................................1006
 a. *Transfers From Western Traffic* .................................1006
 b. *Removal of Harris from His "Post Car"* ...........................1008
 c. *Intensity of Disciplinary Investigations* ...........................1009
 2. Retaliatory Harassment .........................................1009

VI. CONCLUSION ...............................................1010

## I. INTRODUCTION

Plaintiffs Calvin Westley Settle ("Settle") and Keith Harris ("Harris") are African American officers in the Baltimore County Police Department ("the Department"). They have filed separate actions against Baltimore County and several present and former supervisory officers alleging discrimination based on race and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Harris also alleged a conspiracy claim under 42 U.S.C. § 1985 and constitutional claims under 42 U.S.C. § 1983 for deprivation of his rights to freedom of speech and association and equal protection under the First and Fourteenth Amendments to the United States Constitution.[1]

---

1. Specifically, Settle's First Amended Complaint alleges the following claims:

 Count I: 42 U.S.C. § 1981 retaliation against defendant Earp in his individual capacity; Count II: 42 U.S.C. § 1981 retaliation against defendant Hall in his individual capacity; Count III: 42 U.S.C. § 1981 claim against defendant Foxwell in her individual capacity; Count IV: 42 U.S.C. § 1981 claim against defendant Ward in her individual capacity; Count V: 42 U.S.C. § 1981 claim against defendant Gambrill in his individual capacity; Count VI: Title VII claim against Baltimore County (race discrimination); Count VII: Title VII claim against Baltimore County (retaliation).

Harris's Third Amended Complaint alleges the following claims:

 Count I: Title VII claim against Baltimore County (disparate treatment based on EEOC charge no. 120901089); Count II: Title VII claim against Baltimore County (disparate treatment based on EEOC charge no. 1209499824); Count III: Title VII against Baltimore County (retaliation); Count IV: 42 U.S.C. § 1981 claim against Baltimore County and the individual defendants in their individual capacities; Count V: 42 U.S.C. § 1983 "Freedom of Speech Violation" claim against the individual defendants in their individual capacities; Count VI: 42 U.S.C. § 1983 "Freedom of Association Violation" claim against the individual defendants in their individual

By order dated August 29, 1997, I consolidated these cases for the purposes of discovery, with a view to a likely joint trial.[2] The close interrelationship of the plaintiffs' claims and their factual bases make it sensible to adjudicate the pending motions for summary judgment in one opinion, and I do so here.

Defendants have filed motions for summary judgment as to all claims on a multitude of grounds. The parties' exhaustively-briefed submissions have been carefully considered, and no hearing is necessary. Local Rule 105.6 (D.Md.1997). After setting forth the undisputed facts established by the parties' submissions (section II), I shall proceed to explicate the legal framework and doctrinal backdrop from which the plaintiffs' myriad claims arise (section IV). Specifically, I shall analyze separately the legal principles underlying the plaintiffs' Title VII (and § 1981) claims, to wit: (1) disparate treatment/discrete act; (2) disparate treatment/hostile environment; and, (3) retaliation. Thereafter, the legal framework of Harris's constitutional claims is briefly considered; those claims are not further discussed because they are manifestly without merit or simply redundant of the statutory claims. Finally, in section V, I shall apply the law to the undisputed facts as to the above three categories of claims. For the specific reasons stated in section V, I shall grant defendants' motion for summary judgment.

## II. UNDISPUTED FACTS ESTABLISHED IN THE SUMMARY JUDGMENT RECORD

The facts are many. I will, of course, present the plaintiffs' versions of the facts wherever the parties' evidence conflicts, at least to the degree that plaintiffs' allegations have support in affidavits, depositions or other admissible documentary evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The summary judgment record includes

many unsworn statements taken from, *inter alia,* rank and file police officers who worked in the same unit as the plaintiffs (among other witnesses). These statements were generated during various internal investigations conducted by the Department (including investigations of discrimination complaints made by plaintiffs) and the parties have asked the court to consider them in connection with the pending summary judgment proceedings, notwithstanding the failure of these statements to conform to Rule 56 standards.

While I shall accede to the parties' requests in these regards, I pause for a moment to register my displeasure at being asked to do so. Rule 56 serves a salutary purpose: within the framework of the procedural and evidentiary rules relevant to a trial before a jury, it allows the court to perform its screening function appropriately. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987)("Recent cases of the Supreme Court have made increasingly clear, however, the affirmative obligation of the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial.")(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, supra; Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Apparently, the parties here have not wished to assume the full cost and expense of conducting proper discovery as contemplated by Fed. R.Civ.P. 26, *et seq.* Regrettably, this inability and/or refusal to frame the factual issues appropriately can only ultimately harm the plaintiffs as the parties bearing the burden of projecting admissible evidence sufficient, if believed, to establish their claims by a preponderance of the evidence.

Inexplicably, with only one or two exceptions, plaintiffs have not taken discovery

capacities; Count VII: 42 U.S.C. § 1983 "Equal Protection Violation" claim against the individual defendants in their individual capacities; Count VIII: 42 U.S.C. § 1985 conspiracy claim against Baltimore County and the individual defendants in their individual capacities; Count IX: 42 U.S.C. § 1983 against Balti-

more County (policy, practice and custom of race discrimination and retaliation).

**2.** By the same order, I also dismissed Harris's 42 U.S.C. § 1981 claims against Baltimore County and against the individual defendants in their official capacities.

from any non-party witnesses. Rather, much of their ostensible "proof"of the existence of the alleged broad-based, deeply-ingrained racially discriminatory and racially hostile practices on the part of their supervisors consists of *their own prior statements and allegations that such discrimination* existed. Thus, in the absence of any direct evidence that their supervisors are bigots, the chain of inferences on which the plaintiffs rest their claims is extraordinarily tenuous, indeed, as will be made clear. While I understand and am sympathetic to the reality that, even under the best circumstances, direct proof of discriminatory intent is exceptionally difficult to obtain, this difficulty does not relieve plaintiffs of the burdens of production imposed by Rule 56 and the well-established legal regime for analyzing employment discrimination claims for purposes of summary judgment. With these observations in mind, I proceed to give an account of the facts in the light most favorable to the plaintiffs as such facts are properly supported by the record.

\* \* \* \* \* \*

Settle and Harris have been employed by the Department since September 1985 and October 1981, respectively, and they continue to be so employed. During various times relevant to this case (though not presently), defendant Michael Darrell Gambrill ("Chief Gambrill") was the Chief of the Department, Settle and Harris worked in the Western Traffic Division ("Western Traffic") under the direct supervision of defendant Sergeant Ronald Earp ("Sgt.Earp") and Lieutenant Paul Franzoni ("Lt.Franzoni"), who at most times relevant to this case was a sergeant. Sgt. Earp and Lt. Franzoni, as plaintiffs' first level supervisors, are alleged to be the principal discriminating actors in respect to the plaintiffs' allegations.

During periods relevant to the issues presented, defendant Lieutenant Minda Foxwell ("Lt.Foxwell") held supervisory positions in the chain of command. Defendant Captain Howard Hall ("Capt.Hall") also held a supervisory position within the relevant chain of command at the Department during the times relevant to this case. During 1993 and 1994, defendant Major Mary K. Ward ("Maj.Ward"), then a captain, was in charge of the Department's Internal Affairs Office ("IA"). As such, she exercised general supervisory responsibility over investigations of wrongdoing by sworn officers, whether the underlying complaints were made by persons outside or inside the Department, and including complaints of unlawful employment practices.

It is appropriate to note at the outset that there were several African American officers other than the plaintiffs in Western Traffic throughout the relevant period. One or two of those officers have expressed strong dissatisfaction with the manner in which certain decisions were made and/or implemented, and indeed, at least one of them has also instituted employment discrimination claims in this court. Nevertheless, the defendants have submitted overwhelming evidence that the majority of African American officers in Western Traffic were of the view that it was a workplace reasonably free of race-based animus or disparate treatment based on race. Officers Victor Williams, Robert Speed and Charles Dunning were similarly situated non-supervisory African American officers who have attested to the lack of any racial animus on the part of supervisors in Western Traffic during the relevant period. Cpl. Randy Brashears is an African American supervisor who not only attests to the lack of any racially-identifiable disparate treatment, but who also expressed criticisms of Settle for his below average enforcement activity (discussed *infra*), which criticisms are largely identical to criticisms leveled at Settle by white supervisors. Brashears also sustained the imposition of discipline on Harris.

Moreover, the Department's Fair Practices Liaison, Det. Brian Matthews, who from time-to-time was involved in the handling of the plaintiffs' many allegations of racially disparate treatment, is an African American. Det. Matthews specifically concurred in the command decision, described *infra*, to transfer plaintiffs from Western Traffic to other assignments in 1996. Finally, Col. Johnny Whitehead, an African American of high rank, was also consulted and involved in the command decision-making regarding the plaintiffs. Thus, although there is an insult-

ing hint in Settle's deposition that other African American officers may have been enlisted to aid in the alleged scheme hatched by whites to destroy his career, *see* Settle Dep. at 64 (suggesting that Brashears rated Settle in accordance with instructions from someone else, presumably a non-African American supervisor), a fact finder would not be presented in this case with a scenario in which African American employees are isolated from sources of support in a work environment dominated by persons outside the same protected class.

In any event, the record reveals that the workplace environment within Western Traffic was for several years overrun with a debilitating racial tension. The papers before the court seem to trace the commencement of this regrettable saga to a 1989 IA investigation of Harris, of which he learned only in May 1990. Starting in January 1989, IA conducted an investigation of Harris based upon suspected misconduct by Harris arising from his alleged association (apparently starting in 1987) with another black officer and other persons who were involved in drug trafficking activity. Internal Affairs determined that the suspicions of Harris were unsubstantiated, but the fact of the investigation is noted in Harris's personnel file.

On or about August 13, 1990, Harris filed a charge with the EEOC alleging a hostile environment/race discrimination claim in connection with the 1989 IA investigation. By letter dated April 8, 1991, the EEOC determined, after a review of the merits, that "[t]he evidence shows [Harris] was not harassed." Baltimore County received its copy of the EEOC determination on April 10, 1991; Harris denies, however, that he received a copy of the letter or the necessary right-to-sue notice in relation to this original charge. By letter dated May 28, 1996, Harris requested and ultimately received another right-to-sue notice based on the 1990 charge. The second right-to-sue notice was issued on September 16, 1996, shortly after Harris instituted this action, and he filed an amended complaint to include the 1990 allegations as grounds for relief in this case.

As elaborated upon herein, the original Harris IA investigation, *inter alia*, provides a remote backdrop to the myriad claims asserted in this case. Several seemingly unrelated events, the truth and accuracy of which Settle and Harris seem to have come to believe or accept by early 1993, provide more immediate background to the filing of the first EEOC charge by Settle on March 2, 1993. First, in or about May 1992, Sgt. Earp, who was responsible for making the officers' schedules, altered Settle's permanent days off from Sunday and Monday to Wednesday and Thursday. Settle objected to this change. At the same time, according to Settle, Earp allowed a less-senior white officer, Officer Gregory, to retain Sunday and Monday as his days off.

Second, later that year, in December 1992, Settle observed Sgt. Earp in possession of a device which Settle regarded as a "noose" and which is described *infra*. Settle was offended by this observation (it brought to mind America's legacy of racial lynchings), and he regarded Sgt. Earp's possession of this item as an act of racial harassment tending to create a hostile work environment in Western Traffic for African Americans.

Third, during 1993, as Settle and Harris learned later, Sgt. Earp attempted to monitor the on-duty movements and locations of Settle, Harris and other African American officers using the Department's Automatic Vehicle Locator ("AVL").[3] The AVL is a computer system which allows a police radio dispatcher to view a system map to locate an officer's vehicle. It is activated by a dispatcher upon request, and it is generally used to locate a vehicle, *inter alia*, only when the safety of an officer is in question. Use of the AVL is not apparent to the officer whose location is being monitored. Plaintiffs assert that this action by Sgt. Earp constituted evidence of racial animus because, allegedly, Sgt. Earp did not monitor the locations and movements of white officers.

Finally, during the time leading up to the filing of Settle's first EEOC charge, Settle

---

**3.** As discussed *infra*, it is unclear whether Settle and Harris actually knew of any efforts to monitor their movements at the time Settle filed his first EEOC charge in March 1993.

and Harris came to believe that Sgt. Earp habitually deprived them of training opportunities by purposefully failing to notify them of such opportunities in the manner and with the consistency with which he notified white officers of such opportunities.

On March 2, 1993, after a dispute apparently involving an alleged act of insubordination, Settle filed his first charge with the EEOC. He alleged discrimination on the basis of race, in that "Black officers are treated like suspects while White officers are treated more favorably." Several weeks later, on March 25, 1993, a high-ranking officer in the chain of command for Western Traffic, Major William Kelly ("Maj.Kelly") called a meeting of Settle, Harris and other black officers in an effort to address the concerns of Settle, Harris and those sharing their views that the environment in Western Traffic was infected with racially discriminatory attitudes which had given rise to disparate treatment and acts of harassment.[4] Lt. Foxwell and Maj. Ward attended the meeting, which apparently focused on the alleged racially discriminatory behavior by Sgt. Earp. The effort to resolve the issues presented failed miserably, however, and the next day, Settle and Harris (joined by one or two others) filed a formal complaint with IA, assigned number 93–A–107 ("IA 93–A–107"), alleging race discrimination by Sgt. Earp based on the circumstances described above.

The investigation of IA 93–A–107 was conducted by Detective Yvonne Callahan ("Callahan"), an African American, under the immediate supervision of Sgt. Adrian Hughes. The record provides overwhelming evidence that the investigation was wide-ranging, thorough and professionally conducted. Callahan did not conclude her investigation (including reviews up the chain of command) until December 1994. During her investigation, she (and/or Sgt. Hughes) interviewed every officer at Western Traffic. Additionally, she interviewed Settle and Harris in connection with their allegations on several occasions, at their request, so that they could supplement the information already supplied to IA by them. In the course of the investigation, moreover, Settle and Harris filed in excess of a half dozen formal written supplements to the original complaint. Many of the witness interviews were tape-recorded, as were some of those conducted of Settle and/or Harris. Ultimately, Callahan determined that the plaintiffs' allegations of disparate treatment and harassment were unfounded.

In the meantime, the animosity and opprobrium between Settle and Harris, on one side, and their supervisors and co-workers on the other side, grew in scale and intensity, such that ultimately the bad feelings permeated the workplace. Friction points between the complainants and their supervisors and co-workers ran the gamut of interpersonal difficulties ranging from the seemingly trivial to the profoundly serious.

Sometime after the March 1993 meeting, Harris requested as his permanent days off Thursday and Friday. Sgt. Earp denied the request. Not long thereafter, however, Sgt. Earp granted two white officers, Officer Isaac and Officer Leichling, Thursday and Friday as permanent days off. (Much later, in September 1994, Sgt. Earp granted Harris Thursday and Friday as permanent days off.). As discussed below, plaintiffs have relied on the circumstances surrounding the scheduling of days off as one of the key elements of their claims.

On April 8, 1993, approximately two weeks after the meeting was held to address racial discrimination issues, Harris's "post car" was damaged.[5] Assignment to a "post car" is

---

4. The other black officers attending the meeting were Tim Fowlkes, Sheldon Blackwell, Charles Dunning and Charles Floyd. Harris has included a First Amendment retaliation claim on the theory that his mere attendance at the meeting gave rise to retaliation efforts by defendants because he "associated" with other African American officers.

5. There is substantial evidence in the record that this alleged incident did not take place when and

as it is described in text. Rather, there is evidence (directly from Harris) that this incident predated March 1993 and that it had nothing whatsoever to do with race, but that the vehicle was damaged in connection with a change of procedure requiring another officer to drive an older, less desirable vehicle. For purposes of summary judgment, I shall credit the account most favorable to Harris.

emblematic of a job "perk" whereby, although officers do not take their assigned vehicles home at the end of their shift, they are allowed to use the same vehicle and patrol the same area on a regular basis. The damage to Harris's "post car" consisted of the radar wires being cut and a "cut mark" appearing on one of the tires. The Department never determined who damaged Harris's "post car." Harris viewed the incident as evidence of racial animus aimed at him. Indeed, assuming the damage to the vehicle was purposefully inflicted in April 1993, the scant evidence of record on this issue does appear to support Harris's belief that the vandalism was aimed at him. *On the other hand, there is no evidence as to the identity of the perpetrator, and there is no evidence that, assuming Harris was targeted, he was targeted because he is African American, or that he was targeted because he complained of alleged racial discrimination.*

A major element of the plaintiffs' claims relate to allegations of disparate discipline. These claims are asserted in two analytical dimensions. First, each plaintiff claims that, assuming he committed infractions similar in gravity as did white officers, white officers received more favorable (or less harsh) disciplinary treatment than he received. Second, each plaintiff claims that *allegations* against him of misconduct were treated more formally, and were investigated more thoroughly, than allegations against white officers and, also, plaintiffs contend, more thoroughly than the plaintiffs' own allegations of discriminatory and retaliatory treatment. Thus, the internal affairs machinery of the Department, under Major Ward's leadership, is implicated directly and indirectly in plaintiffs' hypothesis of a wide-ranging scheme to treat them discriminatorily on the basis of race and to inflict "employment injuries" upon them in retaliation for resisting the discrimination treatment.

The record discloses that during 1993, in connection with their claims of disparate discipline, Settle and Harris, respectively, were investigated by IA regarding separate incidents of alleged or perceived neglect of duty. Each of these instances will now be set forth in some detail.

In respect to one incident, Settle and a white officer, Timothy McLaughlin ("McLaughlin"), were charged in the same complaint, IA 93–308, with failure to perform their duties properly by not fully investigating the circumstances surrounding a suspected drunken driving offender. The incident began when a motorist was rear-ended by a driver who (though not smelling of alcohol) staggered and otherwise appeared to be, and acted as if he were, intoxicated. The driver left the scene before police arrived.

McLaughlin was the responding officer; by the time he arrived at the scene of the first accident, the fleeing driver had become involved in a second, similar accident a short distance away, as to which Settle was the responding officer. McLaughlin took the "victim" motorist from the first accident scene to the scene of the second accident in an effort to identify the driver. The "victim" motorist identified the driver in the second accident as the driver in the first accident. McLaughlin then drove the "victim" motorist back to his vehicle and completed a report (he issued five citations), but he did not perform field sobriety tests on the fleeing driver, apparently taking the view that the immediate investigation of the driver's condition was Settle's responsibility, as Settle was in charge of the investigation of the second accident.

Settle investigated the second accident and, like McLaughlin, failed to perform field sobriety tests on the driver. Settle apparently relied on the second hand account of a paramedic who was on the scene. According to the paramedic, the at-fault driver had taken certain medications, including Zanax and Placidil, which probably accounted for his seeming inebriated state.

The wife of the "victim" motorist filed a complaint against Settle and McLaughlin and insisted that the complaint be handled formally. Thus, a disciplinary trial board heard the complaint. The trial board found that "both officers failed to conduct a thorough investigation at the scene." The trial board recommended forfeiture of two days leave for each officer. Ultimately, however, McLaughlin received a lesser punishment, "formal counseling by supervisors," than Set-

tle (the more experienced officer and the only one specifically assigned to traffic duties), who received one day loss of leave. Settle appealed the sanction to the circuit court, which overturned the loss of leave. The Department appealed the reversal of the sanction to the Maryland Court of Special Appeals, which reinstated the one day loss-of-leave penalty.

Settle contends the difference in sanctions meted out to him and McLaughlin is explained by racial discrimination. It must be noted that Settle's attorney actually called Sgt. Earp as a "character witness" for Settle (presumably with Settle's approval). Earp described Settle as a good officer who had had "some problems" in the past. Thus, even though a complaint filed by Settle of racial discrimination was pending against Sgt. Earp, the latter nevertheless "went to bat" for his subordinate in the disciplinary proceedings and Settle was willing to accept from Sgt. Earp such help as the latter could offer.

Harris was also investigated for an incident occurring in 1993, after he and Settle had instituted their internal charge of discrimination. In August 1993, then Cpl. Franzoni filed a report which led to the institution of formal charges against Harris for failure to perform duties in connection with an incident at the Liberty Court shopping center. The charge was formally lodged by Lt. Foxwell but was based on Franzoni's information. It alleged that Harris had failed to assist a private security guard (who was African American) to apprehend an alleged shoplifter. In or about December 1993, the formal disciplinary process commenced and, at one point, it was recommended that Harris should receive five days loss of leave. At some point in the proceedings, Cpl. Brashears, an African American, reviewed the circumstances and sustained the charge against Harris. Harris was ultimately acquitted of this charge after a prolonged adjudicatory process involving numerous delays, some of which were due to the on-going discrimination complaints. Harris vigorously contends that even assuming a formal disciplinary process was appropriate for this incident of alleged neglect of duty

(which he does not concede), the failure of the Department to institute formal disciplinary proceedings against white officers whom he contends were reasonably suspected of equally or more serious infractions exposes the discriminatory motive behind the disciplinary proceedings instituted against him.

As proof of the discriminatory motive animating the disciplinary proceedings against him, Harris undertakes to contrast his treatment in connection with the Liberty Court incident, *inter alia*, with that accorded a white officer he argues was similarly situated. As detailed *infra*, according to Harris's account, in August 1993, Franzoni instructed Officer Lally to leave the scene of a personal injury motor vehicle accident without giving complete assistance to the injured and putting at risk the "chain of custody" of some unspecified evidence. Harris views the failure of the Department to discipline Officer Lally and/or Franzoni for this incident as evidence of discrimination. For the reasons discussed below, I conclude as a matter of law that the Lally incident is not comparable to the Liberty Court incident.

In any event, in March 1994, Harris filed a racial discrimination charge with the EEOC based on the disciplinary proceedings against him arising from the report by Franzoni in connection with the Liberty Court incident. He also alluded in that charge to the March 1993 meeting and the ongoing IA investigation arising therefrom. Also in March 1994, Harris filed an official Departmental communication (a "12L") with then Capt. Ward of IA regarding alleged disparate treatment by Franzoni. Harris contends that Ward's unfavorable finding as to this complaint is probative of discrimination and retaliation by Franzoni, Ward and Baltimore County.

In April 1994, Franzoni issued a negative "performance observation" of Harris and removed him from his post car. The observation stated that Harris had recently made inappropriate comments over the radio regarding responding to calls outside of his post. The observation also noted that Harris had a history of similar acts. *The documentary record before the court confirms this assertion.* As early as 1991, Harris had a habit of making inquiry over the police radio

as to the availability of, or the whereabouts of, the regularly assigned patrol or traffic officer when he, Harris, was directed to respond to a need for police assistance at a location that was not in his assigned area. The record discloses that Harris's supervisors were annoyed by this habit and cited it against Harris in his performance evaluations.

In September 1994, Settle filed a second charge with the EEOC, which he amended (by counsel) in June 1996. The charge alleged, *inter alia*, that the Department had not taken meaningful steps to redress the continuing harassment Settle believed he was experiencing, or to address in a meaningful way Settle's complaints of harassment, most if not all of which were directed at acts and omissions by Franzoni. (The 1996 amendment to the charge expanded the bases for the charge to include additional acts of retaliation and race discrimination.).

In December 1994, at the conclusion of the IA investigation under the direction of Det. Callahan, Capt. Hall, Maj. Ward and Maj. Kelly met with Settle and Harris regarding their internal complaints of discrimination, i.e., IA 93–A–107. Maj. Ward indicated that it had been determined that the allegations lacked merit. Settle and Harris allegedly became quite hostile during the meeting. Each was offered an opportunity for reassignment and each declined the opportunity.

During the meeting mentioned above, Capt. Hall reiterated earlier warnings that Settle would lose his "post car" if he continued to write a below-average number of speeding enforcement citations. This issue forms a key ingredient to Settle's claims. It appears from the record that Settle has long insisted that a sort of "kinder and gentler" approach to traffic enforcement was desirable. Thus, while Settle generally made an appropriate number of traffic *stops,* he issued a far greater percentage of *warnings* (rather than *violations,* and specifically speeding violations) than his supervisors deemed acceptable. Settle seemingly contends, alternatively, that warnings did and should count the same as violation citations, and/or that the defendants simply used the alleged disparity as a pretext to take racially discriminatory

actions against him. As the defendants have pointed out, on deposition Settle simply refused to acknowledge that he (and every officer) had a responsibility to conform to his supervisors' repeated demands that he measure up to even *informally* imposed quotas for speeding enforcement citations.

In connection with this issue, in January 1995, Sgt. Earp issued a "rating," which stated that Settle wrote too few speeding citations. In that written performance evaluation, Sgt. Earp reiterated the earlier statements made by Capt. Hall that Settle could be removed from his post car for these alleged citation-writing deficiencies. Settle contends that as of the date of the "rating," Sgt. Earp had been his supervisor for such a brief period that he was not qualified to issue such an evaluation, and that his decision to do so is evidence of racial animus. Settle, unlike Harris, never lost his "post car," but he complains, nevertheless, that the *threats* his supervisors made that he might lose his "post car" constitute cognizable Title VII violations.

As might be gathered from the above recitation of facts (set forth in the light most favorable to the plaintiffs), the two years (spring 1993 to spring 1995) following the filing of Settle's first EEOC charge (which was followed immediately by the filing of the internal charges and the Callahan investigation) were marked by an incessant deterioration in the relationship between the plaintiffs and their supervisors in the relevant chain of command. The picture sketched by the parties' submissions is of a workplace in which there existed palpable distrust and contempt on many sides. Multiple discrimination charges were floating around the unit and formal disciplinary actions were pending throughout the relevant period, including formal adversary proceedings, at least one of which was within the state judicial system.

The plaintiffs' work situation and the atmosphere at Western Traffic deteriorated further as a result of an incident in May 1995. Two patrol officers from another precinct filed a complaint against Settle and Harris for neglect of duty. Specifically, the officers alleged that they had responded to a broadcast of a bank robbery in progress, but that

Western Traffic cars number 167 and 169, which were observed idling in a parking lot of a nearby hotel, inexplicably failed to respond to the robbery alert. Settle and Harris, respectively, were in cars 167 and 169. It is not entirely clear why or how the complaining officers could be certain that Settle and Harris had received and heard the robbery dispatch. Nevertheless, the record shows that Settle and Harris did indeed hear the robbery alert, but that they apparently took the view that as traffic officers, they were not required to respond to such a routine non-traffic-related call.

In any event, the officers submitted their complaint through proper channels and it fell to Lt. Foxwell to decide how it should be handled. Lt. Foxwell asserts by way of her affidavit that "due to the serious nature of this allegation, I was ... obligated to refer the matter to Internal Affairs." Thus, the plaintiffs became yet again the subjects of a formal disciplinary investigation by the Department. Ultimately, they were found not guilty of all charges in connection with this incident, but they regard Lt. Foxwell's decision to forward the complaint for formal handling by IA as evidence of race discrimination and retaliation.

By spring 1996, the circumstances in Western Traffic had deteriorated to the point where African American officers other than Settle and Harris were seeking or were stating an intention to seek a transfer from the unit because of the turmoil prevalent in the unit. Without question, several of them attributed the discord to unwarranted actions and complaints being prosecuted by Settle and Harris. Finally, one supervisory African American, Sgt. Richard Howard, reported to Lt. Foxwell that Settle had threatened to "take down" all of the supervisors at Western Traffic. This proved to be the last straw. On April 2, 1996, Capt. Hall effected an involuntary transfer of Settle and Harris. They were permitted to retrieve their personal belongings; however, they were immediately escorted out of the building under the watchful eye of another officer. On the same day, the building entry code was changed to one not known by Settle or Harris. The new code, Settle and Harris later learned, was "10–24," which was the Department's radio code meaning "assignment completed." The plaintiffs rely on the circumstances surrounding their reassignment and the selection of the new entry code as additional evidence of racial animus and retaliatory motive.

## III. SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a mo-

tion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy,* 929 F.2d at 1012.

## IV. LEGAL STANDARDS APPLICABLE TO PLAINTIFFS' CLAIMS

Plaintiffs seek damages and other relief, primarily on the grounds of what they contend was a purposeful and broad-based scheme to discriminate against them in respect to the terms and conditions of employment as Baltimore County police officers on the basis of their race, to create an objectively intolerable working environment for them as African American officers through a pervasive and severe series of racially hostile acts and verbal acts, and to retaliate against them for seeking redress for these wrongs. Plaintiff Harris has also alleged that the defendants deprived him of First and Fourteenth Amendment guarantees in their treatment of him. I am persuaded, however, after a searching examination of the summary judgment record, that the record establishes, despite the scope and breadth of their complaints, that plaintiffs are not entitled to present any of their claims to a jury and that defendants are entitled to judgment as a matter of law.

### A. TITLE VII AND 42 U.S.C. § 1981

The Supreme Court has held that the well-known *McDonnell Douglas* proof scheme also applies to claims brought under 42 U.S.C. § 1981. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), and the Fourth Circuit has stated "the framework of proof for disparate treatment claims—that is, whether the employer intentionally discriminated against the employee—is the same for actions brought under Title VII or § 1981."

*Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir.1989). Accordingly, my discussion regarding the plaintiffs' Title VII claims encompasses their intentional racial discrimination claims under 42 U.S.C. § 1981.

In this connection, defendants persist in the view that *Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995), applying *Jett v. Dallas Independent School District,* 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), forecloses Settle's claims under § 1981. I reject this reading of *Dennis.* Settle has sued the individual defendants in their individual capacities—not in their official capacities, as did Harris—and nothing in *Dennis* suggests that such claims are foreclosed. In the view that I take of the claims on their merits, however, the individual claims fail, just as surely as do the other claims. I also assume—without deciding—that a *retaliation* claim lies under 42 U.S.C. § 1981. *See Carney v. American University,* 151 F.3d 1090, 1094 (D.C.Cir.1998)("[O]ur sister circuits disagree about whether retaliation violates section 1981[:] ... *compare, e.g., Andrews v. Lakeshore Rehabilitation Hosp.,* 140 F.3d 1405, 1412 (11th Cir.1998)(finding cognizable retaliation claim under section 1981), *with Von Zuckerstein v. Argonne Nat. Laboratory,* 984 F.2d 1467, 1472 (7th Cir.1993)(finding no such claim).").

### 1. Preliminary Observations

Plaintiffs present this court with a veritable buffet, if not a smorgasbord, of federal employment discrimination claims. It has become quite evident in a growing number of employment discrimination cases in recent years that these cases have begun to pose subtle interpretative and analytical difficulties. In part, this is due to the fact that courts have seen an increasing number of cases in which the ever-blurring line between traditional "discrete act" disparate treatment and retaliation claims, on the one hand, and the more amorphous and ephemeral "hostile work environment" claims, on the other hand, has grown more and more indistinct. Furthermore, courts have begun to see increasing numbers of so-called "retaliatory harassment" claims. *See infra* pp. 993–95.

The knowledgeable reader here is no doubt struck by the fact that, as to their "discrete act" claims, Settle and Harris do not contend that they have been paid less compensation, assigned to more hazardous duty or denied promotions; obviously, they have not been terminated. Indeed, the record shows that both during their tenure at Western Traffic as well as after their transfer from that unit, their performance evaluations have remained average to above average. Thus, Settle and Harris have adduced no admissible evidence that any defendant acted toward them on an overtly racial basis, and in virtually no respect do their complaints relate to easily recognized tangible terms and conditions of employment. Instead, they have, to a very large extent, mounted a challenge to their general overall treatment by supervisors and others they contend are motivated by racial animus. As much if not more than in any discrimination case, plaintiffs' ability to survive summary judgment turns on the strength of the chain of inferences leading to the truth of the hypothesis that facially neutral decision-making was a pretext for race discrimination. "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir.1996).

Relatedly, as to their racial harassment hostile work environment claims, with the exception of the so-called "noose" allegations, there is not a scintilla of evidence in this record of racial epithets, verbal harassment having a racial nexus, inappropriate and distasteful jokes or humor, or any other overtly racial indicia of the presence of racial animus in the workplace at Western Traffic. These evidentiary gaps are telling.

As I detail extensively below, after a careful analysis of the record, I am persuaded that plaintiffs have seized on certain attributes of an admittedly subjective decision-making and supervisory regime in a paramilitary law enforcement organization to cobble together grounds of complaint which, when all is said and done, fail at every turn to project evidence of intentional racial discrimination sufficient to permit a rational fact finder to conclude by a preponderance of the evidence that they have been victims of unlawful discriminatory and retaliatory acts. The plaintiffs' unrefined, almost desperate, approach to the elements of their claims is graphically demonstrated in the following assertions made by Harris in his memorandum:

Plaintiff makes a prima facie case by showing that given all the incidents alleged in his complaint, there is a genuine dispute as to the culpability of Defendants. Although Defendants attempt to isolate each instance of disparate treatment and retaliation, it is important to consider that each occurrence is somehow related to another and that combined they create a full picture of the discrimination and harassment Plaintiff faced. Harris's Mem. Opp. Defs' Mot. Summ. Judg. at 24.

These assertions are troublesome for several reasons. First, avoidance of summary judgment in employment discrimination cases, as in any case, is not remotely a function of the number of "incidents" alleged by a plaintiff as constituting evidence of unlawful discrimination. In particular, a prima facie case of discrimination or retaliation is not established simply by counting allegations, especially where the principal support for those allegations consists primarily, if not solely, of the prior statements of the alleged victim.

Second, while it is certainly true that a court should examine instances of alleged discriminatory treatment holistically and not atomistically, *see Cook v. CSX Trans. Corp.*, 988 F.2d 507, 512 (4th Cir.1993) ("[T]o focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn."), this does not mean that evidence of a large number of meritless claims (or non-cognizable allegations) attains probative value when such claims are aggregated. To the contrary, in the absence of direct or circumstantial evidence of discriminatory intent, careful analysis of claims of disparate treatment in accordance with the well settled *McDonnell Douglas* paradigm is absolutely required.

Finally, the suggestion that each of many instances of alleged discrimination are "somehow" related one to another misapprehends plaintiffs' burden, that is, to make a showing that a reasonable fact finder could reasonably find the facts in favor of the plaintiff.

In this light, I shall proceed to examine the plaintiffs' claims. Before proceeding, however, it is important to clarify several issues which the parties' memoranda incompletely explicate, but an adequate appreciation for which is critical to a complete understanding of the legal regime through which plaintiffs' myriad claims must be filtered.

### a. *No Cognizable Pattern and Practice Claims Are Before the Court*

This case is not a class action. Thus, any suggestion that the plaintiffs are pressing "pattern and practice" claims is misplaced. *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 760–62 (4th Cir.1998), *petition for cert. filed*, 67 U.S.L.W. 3409 (Dec. 14, 1998).

### b. *Plaintiffs' Statistical Evidence Lacks Probative Value and is Inadmissible*

The plaintiffs have sought to rely on an in-house review conducted by Baltimore County of the performance ratings received by officers working in Western Traffic, the so-called "Wickless Report." For the reasons stated here, the Wickless Report is entirely lacking in probative value and is, in any event, inadmissible.

■ In connection with the investigation of IA 93–A–107, Robert Wickless of the Department's Personnel Services Division reviewed performance appraisals for all officers from 1/1/90 to 7/1/93 and undertook to assess from his review whether intentional discrimination was evident. The statistical evidence derived from the report is patently inadmissible. *See Moultrie v. Martin*, 690 F.2d 1078, 1082, 1083 n. 7 (4th Cir.1982)(directing that "[i]n all cases involving racial discrimination, the courts of this circuit must apply a standard deviation analysis such as that approved by the Supreme Court in *Hazelwood* [*School District v. United States*, 433 U.S. 299, 309 n. 19, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)] )," cautioning against the use of small

sample sizes and noting that ("[p]opulation sizes of less than 30 to 40 are generally considered to be small samples . . . ."). Manifestly, Wickless performed the very "straight percentage comparisons" condemned by the Fourth Circuit in *Moultrie*. *Id.*

Furthermore, on deposition, when plaintiffs' expert was pressed to explain how he had manipulated the statistics contained in the Wickless Report, he conceded that his "wife ran the numbers" and he would have to check with her. *See Carter v. Ball*, 33 F.3d 450, 457 (4th Cir.1994)("[I]f a plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence.") (citation omitted).

Finally, the Wickless report itself has so many disclaimers that it lacks all probative value and is inadmissible. Wickless wrote, "5.6% of the ratings for white males were below average as compared to 7.9% for black males, 42.2% of the ratings for white males were average as compared to 79% for black males, 52.2% of the ratings for white males were above average as compared to 13.1% for black males." Wickless concluded: "It isn't difficult to see, based on a review of value judgments [sic] alone, that black males, as a sub group, are not represented by a proportionate number of commendable or exceptional ratings. *The reasons for this, however, are difficult to ascertain and are only speculative at best.*"(emphasis added). Wickless went on to state:

In reviewing justifications for above average level judgments [sic], it appeared to be considerably more difficult for a black male to obtain an above average rating. This seemed to be the case even when justifications implied a commendable or exceptional rating be given and I believe more commendable and exceptional ratings were warranted. When comparing comments for justifications between the 2 groups, what was judged commendable for a white male was often competent for a black male. Likewise, what was judged exceptional for a white male appeared to be judged commendable for a black male. This trend, while not applied discriminate-

ly to any one individual, did appear to be an issue with ratings for the black male group. *I don't believe it was intentionally applied, but it did result in distinctly fewer above average ratings for the black male group.*

\* \* \* \* \* \*

*The only discriminatory pattern present (other than as described in the paragraph above) is rather elusive.* It is nonetheless worth mentioning and cause for concern. . . . I did note that, taken as a whole, a certain difference in attitude toward evaluation between black and white males appeared to exist. Especially in relation to comments made to justify rating judgments [sic], it appeared that there was a general expectation among raters that white males should and would do well while black males probably could not be expected to do so well. *This is an area that is, admittedly, hard to quantify, especially in light of the fact that when a black male clearly excelled, he was judged as doing so.* While the obvious exceptions—both exceedingly good and bad—were identified and documented as would be expected, the range for fair to competent to commendable seemed to blur. It was in these areas where raters' expectations seemed to differ in reviewing performance for black and white males. *Whether this trend helped or hurt the ratings for black males overall is not clear.* In some cases, above average performance, as noted in the paragraph above, may not have been judged as such. On the other hand, below average performance—except for critical issues—may not have been dealt with as stringently as when encountered in white males . . . . *All of the above leads me to believe that—at least in terms of performance appraisals—racial discrimination was not epidemic in Western Traffic during the period from 1/1/90 to 7/1/93. This is not to say that it did not exist in some form, but that it was not calculated, intentional, or overt.* (emphases added).

These speculative musings on incomplete and inadequate data, based on an examination which failed to employ scientifically valid techniques, and unsupported by an expert sponsor, add nothing to the plaintiffs' showing in this record. Accordingly, the Wickless Report is not accorded any weight in my consideration of the issues generated by the pending motions for summary judgment.

c. *Many of the Plaintiffs' Allegations Do Not Constitute Material Adverse Employment Actions and Are Therefore Not Cognizable*

"[E]mployment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred." *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). In *Page v. Bolger,* 645 F.2d 227 (4th Cir.)(in banc), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), the Fourth Circuit examined the question of what constitutes "adverse employment action" and stated that inquiries "consistently focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensation." *Id.* at 233. The Court went on to state:

> Among the myriad of decisions constantly being taken at all levels and with all degrees of significance in the general employment contexts covered by Title VII there are certainly others than those we have so far specifically identified that may be so considered, for example, entry into training programs. By the same token, it is obvious to us that there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within . . . Title VII.

*Id.* (citation omitted). *See also Munday v. Waste Management of N. Am., Inc.,* 126 F.3d 239, 243 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998)("In no case in this circuit have we found an adverse employment action . . . without evidence that the terms, conditions, or benefits of [plaintiff's] employment were adversely affected."); *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 708 (5th Cir.), *cert.*

*denied,* —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997)(applying *Page*).

In contrast to the unmistakable rule in the Fourth Circuit, which unquestionably imposes the "adverse employment action" requirement in all "discrete act" discrimination and retaliation claims, the Seventh Circuit has speculated that the requirement of an "adverse employment action" may not apply to retaliation claims:

> No limiting language appears in Title VII's retaliation provision. 42 U.S.C. § 2000e–3(a). The language of "materially adverse employment action" that some courts employ in retaliation cases is a paraphrase of Title VII's basic prohibition against employment discrimination, found in 42 U.S.C. §§ 2000e–2(a)(1) and (2). Under these provisions, there is no actionable discrimination without something that can be described as an adverse employment action—"discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment," as subsection 2(a)(1) puts it, or "limit[ing], segregat[ing], or classify[ing] ... employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," as subsection 2(a)(2) puts it. The provision regarding retaliation may intentionally be broader, since it is obvious that effective retaliation against employment discrimination need not take the form of a job action. Shooting a person for filing a complaint of discrimination would be an effective method of retaliation, though, as *Nelson* points out, 51 F.3d at 388, the victim of the retaliation would have other, and more powerful, remedies than a suit under Title VII. This would be a reason for confining the provision to retaliation that takes the form of an adverse job action. How serious the adversity need be is a separate question, also difficult.

*McDonnell v. Cisneros,* 84 F.3d 256, 258–59 (7th Cir.1996).[6] Nevertheless, consistent with the Fourth Circuit's decision in *Page,* the Seventh Circuit has also stated:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993). *And see Johnson v. DiMario,* 14 F.Supp.2d 107, 110 (D.D.C.1998):

> There is a circuit split on [the issue of what constitutes adverse employment actions]. The Fifth and Eighth Circuits agree with the Fourth Circuit and hold that only adverse actions rising to the level of an ultimate employment decision are actionable under Title VII. *See Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997); *Mattern v. Eastman Kodak Co.,* 104 F.3d 702 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260. The First, Ninth, and Eleventh Circuits all conclude that Title VII's protection against retaliatory discrimination extend to adverse actions which fall short of ultimate employment decisions. *See Wyatt v. City of Boston,* 35 F.3d 13, 15–16 (1st Cir.1994); *Yartzoff v. Thomas,* 809 F.2d 1371, 1375–1376 (9th Cir .1987); *Wideman v. Wal–Mart Stores Inc.,* 141 F.3d 1453, 1456–57 (11th Cir.1998). Although the D.C. Circuit has never addressed *this* precise issue (indeed, it has expressly refused to decide the issue on two occasions, *see Taylor v. FDIC,* 132 F.3d 753, 764–65 (D.C.Cir.1997); *Mungin v. Katten Muchin & Zavis,* 116 F.3d 1549, 1555 (D.C.Cir.1997)), it has indicated that the Age Discrimination in Employment Act's anti-retaliation clause, which is identical to Title VII's, "does not limit its reach

---

**6.** Other courts have expressed their disapproval of *Page* 's limiting interpretation of Title VII. *See, e.g., Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1454, n. 2 (11th Cir.1998) (asserting that the *Page* test of "adverse employment action" is limited to claims by federal employees).

only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer or demotion." *Passer v. American Chem. Soc'y*, 935 F.2d 322, 331 (D.C.Cir.1991). The Court thus concludes that our court of appeals would agree with the First, Ninth, and Eleventh Circuits that Title VII's protection extends to non-ultimate adverse personnel actions. *See also Hayes v. Shalala*, 902 F.Supp. 259, 267 (D.D.C.1995) (noting that when the D.C. Circuit "has spoken, it has adopted a broader interpretation of actionable 'personnel actions' than that of the Fourth Circuit").

14 F.Supp.2d at 110.

■ It is clear, therefore, that "[a]lthough actions short of termination may constitute an adverse employment action within the meaning of the [Title VII] . . . not everything that makes an employee unhappy is an actionable adverse action." *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997) (citations and internal quotations omitted). *See also Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997)("Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'")(quoting *Welsh v. Derwinski*, 14 F.3d 85, 86 (1st Cir.1994))(retaliation claim; internal citation omitted); *Benningfield v. City of Houston*, 157 F.3d 369, 375 (5th Cir.1998)(discussing the meaning of "adverse employment action" in the context of a First Amendment retaliation claim brought by employees of police department); *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir.1998)(discussing meaning of "adverse employment action" in the context of an ADA claim and adopting an objective test of "adversity"); *Merriweather v. Alabama Dept. of Pub. Safety*, 17 F.Supp.2d 1260, 1273–74 (M.D.Ala.1998).[7]

As I examine the record compiled by plaintiffs here in opposition to defendants' motion for summary judgment, I shall be guided by the controlling Fourth Circuit jurisprudence, which rejects Title VII claims based only on "mediate, interlocutory" decisions affecting the employment relationship. Moreover, because I apply an objective test of "adversity," plaintiffs' subjective feelings about the nature of the alleged "employment injuries" they suffered is clearly a necessary but not a sufficient evidentiary showing to withstand summary judgment. *See Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988).

d. *Defendants' Violations of Department Regulations Are Neither Independently Cognizable Nor Substantially Probative*

■ Settle alleges various violations of Department regulations. Specifically, he alleges violations of Special Order # 1–94 which establishes a "zero tolerance" for race discrimination and requires that discrimination complaints and investigations be given immediate attention and that IA maintain personal contact with the victim. Settle alleges that he was not kept informed of the status of IA 93–A–107 and the investigation was unduly delayed in a manner "designed to thwart Plaintiff's ability to receive a fair resolution of his case." This contention is demonstrably false.

As Commander of Internal Affairs, Ward was ultimately responsible for monitoring Settle's race discrimination complaint. Settle alleges that Ward refused to investigate his discrimination complaint. Specifically, he argues that "Ward did not contact Plaintiff about the complaint initially until January 5, 1994, seven and one half months after his complaint was made. Defendant Ward and her subordinates did not allow Plaintiff oral interviews or discussions to update his complaint." Complaint at ¶ 45. The summary judgment record conclusively refutes these contentions. The documents in the record

---

7. The court observed in *Merriweather*:

The court first focuses upon whether Merriweather suffered adverse employment action, that is, whether terms or conditions of employment have been affected. Courts agree that "even under a liberal reading of adverse employment activity, an employee must ultimately show some employment injury." *See Nelson v. University of Maine Sys.*, 923 F.Supp. 275, 281 (D.Maine 1996). In other words, an employment action must affect a term or condition of employment and is not adverse merely because the employee dislikes it or disagrees with it. 17 F.Supp.2d at 1273–74.

show that Ward's office contacted Settle, at the latest, on May 7, 1993, and that there were 27 documented contacts and status updates from either Ward or Hughes to Settle and Harris. Additionally, Settle concedes that he was afforded four separate formal taped interviews so that he could update and elaborate on his complaints.

In any event, allegations that defendants violated internal Department regulations do not implicate Title VII. Settle has not bolstered his alleged hostile environment case because he has not shown that the alleged delay and inactivity during the investigation was based on race or motivated by a retaliatory motive. *See Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 203 (4th Cir. 1998)("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent .... Federal courts cannot ensure that business decisions are always informed or even methodical.") (citation and internal quotation omitted).

Settle also argues that Special Order 1–94 was violated because he and Sgt. Earp were not separated after Settle filed his complaint of race discrimination. Special Order 1–94 requires that supervisors and commanders "limit[ ] the work contact between the members (i.e., victim and accused) when a complaint of harassment or discrimination is pending resolution." Again, this allegation of violation of a policy does not sustain a cognizable Title VII claim absent proof that the failure to separate Settle and Earp was based on race. It appears that Settle took no discovery on this issue, and it does not "speak for itself." Thus, the mere fact that Sgt. Earp was not reassigned to another squad during the investigation of Settle's discrimination charges lacks probative value. An employer is justifiably hesitant to open the door to the potential deleterious effects of widespread "supervisor shopping." *Cf. Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir.1998)(observing that "every employee would file a charge just to get a little unemployment insurance" if merely filing a discrimination charge could insulate an employee from an unpleasant supervisor).

Thus, while instances undoubtedly arise—particularly in the sexual harassment context—in which a failure to reassign might be deemed evidence of employer negligence, *see generally Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998), the Department's decision not to transfer Sgt. Earp does not advance Settle's claims.

2. Disparate Treatment/Discrete Act

Plaintiffs allege several traditional disparate treatment claims. Specifically, they allege that the defendants have discriminated against them in the imposition of discipline, in the conduct of IA investigations, in providing disparate opportunities for training and in approving scheduling requests. In particular, Settle and/or Harris allege that: (1) they were more severely disciplined than white officers for similar alleged misconduct; (2) they were more vigorously investigated for alleged misconduct than white officers; (3) they were denied training opportunities in that they were not notified of such opportunities in the way that white officers were notified; and (4) they were denied permanent days off which were granted to less deserving white officers.

In the absence of direct or circumstantial evidence of a discriminatory motive, claims alleging disparate treatment involving a distinct "employment injury" (e.g., discipline, demotion, discharge, failure to promote) are usually analyzed for summary judgment purposes under the now-familiar proof scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under Title VII, the plaintiff bears the initial burden of proving a prima facie case of discrimination by raising an inference that the defendant acted with discriminatory intent. *Wileman v. Frank*, 979 F.2d 30, 33 (4th Cir.1992). This can be done either through direct evidence of discriminatory intent, or by using the four-part *McDonnell Douglas* scheme which provides an inference of discriminatory intent. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).

*Karpel v. Inova Health Sys. Serv.*, 134 F.3d 1222, 1227–28 (4th Cir.1998). First, plaintiffs must project evidence sufficient to establish a prima facie case of intentionally discriminatory treatment. *Id.* Once plaintiffs do so, the burden of production shifts to the defendants to rebut the presumption of discrimination by articulating a legitimate non-discriminatory reason for its action. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Gillins v. Berkeley Elec. Cooperative, Inc.*, 148 F.3d 413, 416–18 (4th Cir.1998). If the defendants meet their burden of production, the presumption of discrimination created by the prima facie case is rebutted and "drops from the case," *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089, and plaintiffs bear the ultimate burden of projecting evidence sufficient to prove that they have been the victims of discriminatory treatment. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In the Fourth Circuit, to make this latter showing, plaintiffs must project evidence sufficient to prove facts on two different levels. First, plaintiffs must project evidence to establish "[t]hat the employer's proffered reason is unpersuasive, or even obviously contrived," *Hicks*, 509 U.S. at 524, 113 S.Ct. 2742. Such evidence alone, however,

> is not in itself sufficient, under [the Fourth Circuit's] precedents, to survive [an employer's] motion for summary judgment. [The Fourth Circuit] has adopted what is best described as the 'pretext-plus' standard for summary judgment in employment discrimination cases. *See Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 201–02 (4th Cir.1998) . . . .[T]o survive a motion for summary judgment under the *McDonnell Douglas* paradigm the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action.

*Gillins*, 148 F.3d at 416–17.

To reiterate, then, to make out a prima facie case of disparate treatment, each plaintiff must project evidence sufficient to show that: (1) he is a member of a protected class; (2) he has satisfactory job performance; (3) he was subjected to an adverse employment action; and (4) that similarly situated employees outside the plaintiff's class received more favorable treatment. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

■ In evaluating plaintiffs' efforts to project evidence of a prima facie case, it must be recalled that Title VII's protections do not insulate one from either the normal day-to-day dissatisfactions and annoyances commonly arising in any workplace or from the sometimes unpleasantness of a surly, strict or even personally insufferable and demanding supervisor:

> [Plaintiff's] deposition testimony makes abundantly clear that he has not adduced evidence of any verbal or written statements which tend to indicate [the defendant] discriminated against him on account of his race. [Plaintiff's] complaints largely concern the legitimate exercise of supervisory authority by [defendant] of the sort that routinely occurs in most employment relationships. *Since supervision and race discrimination are very different, the case law makes clear that a discriminatory animus cannot be inferred from the day-to-day conduct of supervisors that Copeland may deem inconvenient, inconsiderate or insufficiently solicitous. See Spence v. Maryland Cas. Co.*, 803 F.Supp. 649, 670 (W.D.N.Y.1992), *aff'd*, 995 F.2d 1147 (2d Cir.1993)(holding that intimidating behavior of plaintiff's manager may be evidence of impersonable and overly aggressive manager, but without more it does not demonstrate that his actions were motivated by a discriminatory animus).

*Copeland v. Sears, Roebuck and Co.*, 25 F.Supp.2d 412, 418 (S.D.N.Y.1998)(emphasis added).

### a. *Disparate Discipline*

■ Disparate discipline is, of course, a species of disparate treatment. The Fourth Circuit has articulated the analysis applicable

to a claim of disparate discipline in *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985); and *Cook v. CSX Transportation Corp.*, 988 F.2d 507, 510 (4th Cir.1993). In order to establish a prima facie case of disparate discipline under Title VII, a plaintiff must show: (1) he is a member of a protected class; (2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) disciplinary measures enforced against him were more severe than those enforced against other employees. *Id.* If the prima facie case is established, the remainder of the *McDonnell Douglas* burden shifting analysis applies. *Id.*

■ The court must apply a "relative scale" of "gravity" in determining whether the conduct engaged in by the relevant employees is of "comparable seriousness ... in light of the harm caused or threatened to the victim or society, and the culpability of the offender." *Moore*, 754 F.2d at 1107, quoting *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The comparison also requires "an understanding both of the need to compare only discipline imposed for like offenses in sorting out claims of disparate discipline under Title VII and of the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook*, 988 F.2d at 511.

In short, then, "[t]he question confronting a judge faced with determining whether a prima facie case [of discriminatory discipline] under Title VII has been made is whether the record as a whole gives rise to a reasonable inference of racially discriminatory conduct by the employer." *Id.* at 512(affirming summary judgment that no prima facie case was made out). In this regard, it is important to remember that *"[i]n the Title VII context, isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to*

*the entire relevant group of employees."* *Houck v. Virginia Polytechnic Inst.*, 10 F.3d 204, 206–07 (4th Cir.1993)(emphasis added).

b. *Disparate Investigations for the Purpose of Imposing Discipline*

Plaintiffs have not cited any substantial authority to support their "disparate investigation" claim, but I presume that on a proper factual showing, such a claim, patterned on a disparate discipline claim, could be sustained. Nevertheless, as set forth above, to support a disparate investigation claim that is sustainable separate and apart from a cognate disparate discipline claim, in the Fourth Circuit, such a claim must satisfy the *Page* "adverse action" requirement.

■ Thus, plaintiffs have to show not only that the disciplinary proceedings sprang from a discriminatory or retaliatory motive, but that the nature and character of the investigation, which did not lead to the imposition of discipline, actually adversely affected some term or condition of employment, i.e., inflicted an "employment injury." Specifically, if a disciplinary investigation is reasonably rooted in articulable facts justifying such an investigation, neither inconvenience nor emotional anxiety on the employee's part will constitute an "employment injury" sufficient to render the investigation itself an adverse employment action independently cognizable under Title VII.

3. Disparate Treatment/Hostile Environment

Title VII provides, in part, that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e–2(a). Consistent with this language, courts have held that Title VII protects a worker from discriminatory harassing conduct that is so severe and pervasive as to create an objectively hostile or abusive work environment. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)(sexual harassment); *Faragher v. City*

*of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)(same); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)(same); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). This occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. (internal quotations and citations omitted).

 Thus, racial harassment that creates a hostile work environment is actionable under Title VII because it amounts to discrimination in the conditions of employment. *White v. Federal Express Corp.,* 939 F.2d 157, 160 (4th Cir.1991); *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983). To establish a hostile work environment claim, plaintiffs must prove that: (1) the conduct in question was unwelcome; (2) the harassment was based on race; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) there is some basis for imposing liability on the employer. *White,* 939 F.2d at 159–60.

 Harassment is actionable only if it is sufficiently severe or pervasive to "alter the conditions of [the victim's] employment and create an abusive working environment." *Vinson,* 477 U.S. at 67, 106 S.Ct. 2399 (internal quotation omitted)(alteration in original); *see also Faragher,* 524 U.S. at ——-——, 118 S.Ct. at 2283–84 (noting that the Supreme Court's sexual harassment jurisprudence "drew upon earlier cases recognizing liability for discriminatory harassment based on race" and emphasizing that the Court had "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . ."). "A racially hostile working environment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere . . . . The existence of a hostile environment cannot be predicated upon acts that are isolated or genuinely trivial." *Carter,* 33 F.3d at 461. In order to determine whether the conduct alleged by plaintiffs was sufficiently severe or pervasive to sustain a claim, I must examine the totality of the circumstances, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 22, 114 S.Ct. 367.

### 4. Retaliation

To establish a prima facie case of retaliation, plaintiffs must show (1) he engaged in protected activity; (2) defendants took adverse employment action against him; and, (3) a causal connection existed between the protected activity and the adverse action. *Beall v. Abbott Lab.,* 130 F.3d 614, 619 (4th Cir.1997). If a plaintiff carries this burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the action. Once such a reason is proffered, the plaintiff carries the ultimate burden of proving "both that the reason was false, and that [retaliation] was the real reason for the challenged conduct." *Beall,* 130 F.3d at 619, quoting *Jiminez v. Mary Washington College,* 57 F.3d 369, 377–78 (4th Cir.1995); *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 656–58 (4th Cir.1998); *Laughlin v. Metropolitan Washington Airports Auth.,* 149 F.3d 253, 258 (4th Cir.1998).

What the Fourth Circuit recently stated in reversing the denial of a motion for judgment under Fed.R.Civ.P. 50(b) applies with equal force in the context of Rule 56: " 'A jury may not . . . be allowed to infer [retaliation] from evidence that does no more than suggest it as a possibility.' " *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.,* 160 F.3d 177, 182 (4th Cir.1998)(quoting *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 245 (4th Cir.1982))(alterations in *Gibson* ). Accordingly, "[s]ince supervision and [retaliation] are very different . . . a [retaliatory] animus cannot be inferred from the day-to-day conduct of supervisors that [plaintiffs] may deem inconvenient, inconsiderate or insufficiently solicitous." *Copeland,* 25 F.Supp.2d at 418.

### 5. Retaliatory Harassment

Plaintiffs have asserted a form of retaliatory harassment claim. The Fourth Circuit has not had occasion to explicate the contours of such a claim. *But cf. English v. Whitfield*, 858 F.2d 957, 963–64 (4th Cir.1988)(recognizing retaliatory harassment claim under the Energy Reorganization Act of 1974, 42 U.S.C. § 5851(a)); *see Causey v. Balog*, 162 F.3d 795 (4th Cir.1998), *aff'g*, 929 F.Supp. 900, 910 (D.Md.1996)(granting summary judgment in favor of defendants as to retaliatory harassment claim). Consistent with emergent authority in other circuits, I presume that, on a proper factual showing, a plaintiff could meld together the elements of a "traditional" harassment claim, i.e., the creation of an objectively hostile environment through severe and pervasive abusive conduct, with the essential elements of a "traditional" retaliation claim, i.e., reprisal for opposing or participating in the opposition to, discriminatory policies and practices.

Thus, under such a claim, recovery might be available if, despite the absence of a racial or sexual nexus to the creation of the hostile environment, a prima facie case could be established on a showing that a hostile environment was motivated by improper retaliation. "Certainly harassment in retaliation for an employee's protected activities could constitute an 'adverse employment action.'" *Cobb v. Anheuser Busch, Inc.*, 793 F.Supp. 1457, 1491 (E.D.Mo.1990); *Drake v. Minnesota Mining & Manuf. Co.*, 134 F.3d 878, 886 (7th Cir.1998) ("retaliation can take the form of a hostile work environment"); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997)(systematic retaliation in form of reduction of job duties, disciplinary action, negative personnel reports and required remedial training constituted adverse employment action as matter of law); Lex K. Larson, *Employment Discrimination* § 34.04, at 34–57 to 34–62 (2d ed.1995)(arguing that retaliatory harassment may take form of interrogation, reprimands, surveillance, unwarranted or unfavorable evaluations, or deprivation of normal benefits or rights of position, such as overtime, vacations, in-house dispute resolution procedures, office privileges and client access); *Washington v. Jenny Craig Weight Loss Centres*, 3 F.Supp.2d 941, 949 (N.D.Ill. 1998) ("[T]he very gist of a retaliatory harassment action is that the employer has 'lashed out' against an employee for filing discrimination charges, not out of animosity for the employee's race or national origin.") (citation omitted).

### B. HARRIS'S CONSTITUTIONAL CLAIMS
#### 1. First Amendment Claims

Harris's principal First Amendment claim is apparently based on a contention that one or more defendants retaliated against him for complaining about alleged race discrimination. The elements of such a claim are well known in this Circuit:

> To prevail [on a First Amendment claim under 42 U.S.C. § 1983], a public employee has the initial burden to prove that the allegedly protected speech (1) involved a matter of public concern and that his interest in commenting upon it outweighed the employer's interests in efficient operations, and (2) the speech constituted a "substantial" or "motivating factor" in the adverse employment decision. *Hughes v. Bedsole*, 48 F.3d 1376, 1385 (4th Cir.1995). Rather than attempting to define "public concern," the Fourth Circuit takes the approach of requiring that a plaintiff demonstrate that he was speaking as a citizen on matters of public concern, rather than as an employee on matters peculiar to his employment. *See DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir.1995). Even if the employee is speaking as a private citizen, protection depends on a balance between his interest and governmental efficiency. *See id.*

*Childress v. City of Richmond*, 907 F.Supp. 934, 941(E.D.Va.1995), *aff'd in relevant part*, 120 F.3d 476, 483 (4th Cir.1997), *aff'd by equally divided court in relevant part in banc*, 134 F.3d 1205, 1207–08 (4th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 2322, 141 L.Ed.2d 696 (1998); *see also Sharp v. City of Houston*, 164 F.3d 923, 933 n. 21 (5th Cir.1999)(noting that definition of adverse employment action under 42 U.S.C. § 1983 may be broader than under Title VII).

"It is not a constitutional matter when an employee 'speaks not as a citizen

upon matters of public concern, but instead as an employee upon matters only of personal interest' .... In determining whether an employee's speech constitutes speech on a matter of public concern, we are guided by the content, form, and context of the speech in question." *Robinson v. Balog*, 160 F.3d 183, 187–88 (4th Cir.1998) (citation omitted). This case is clearly distinguishable from *Cromer v. Brown*, 88 F.3d 1315, 1325 (4th Cir.1996), in which alleged racial discrimination within a law enforcement agency potentially affected public safety. Considering the record here and examining the "content, form and context" of Harris's speech, it is clear as a matter of law that such speech was not on a matter of public concern but, rather, related exclusively to Harris's own particular individual employment concerns. Thus, I shall not further discuss Harris's First Amendment claims.

### 2. Equal Protection Claims

Harris's equal protection claims (as well as his claims under 42 U.S.C. §§ 1983, 1985) are redundant of his Title VII intentional discrimination claims. To the extent he does not prevail under Title VII, he can not prevail on his equal protection claims. *See Causey*, 929 F.Supp. at 913 ("Plaintiff's ... failure to establish a prima facie case under Title VII ... is fatal to his claims under §§ 1981, 1983 and 1985(3)."), *aff'd*, 162 F.3d 795 (4th Cir.1998).

## V. APPLICATION OF LAW TO THE UNDISPUTED FACTS

### A. DISPARATE TREATMENT CLAIMS

As a threshold matter, defendants move for summary judgment on Count I of Harris's complaint on the basis that the claim is time-barred and, in the alternative, that summary judgment is appropriate on the merits. Count I of Harris's third amended complaint alleges disparate treatment in violation of Title VII in connection with a 1989 IA investigation. In January 1989, Harris was investigated for alleged misconduct based upon his alleged association with another black officer and suspected drug activity. The suspected wrongdoing was determined to be

unsubstantiated but fact of the investigation was noted in Harris's personnel file.

On August 13, 1990, Harris filed a charge with the EEOC alleging race discrimination in connection with this matter. By letter dated April 8, 1991, the EEOC determined, after a review of the merits, that "[t]he evidence shows Charging Party was not harassed." The EEOC determination letter was received by Baltimore County on April 10, 1991. However, Harris denies receipt of the letter. By letter dated May 28, 1996, Harris requested and ultimately received another right to sue letter based on the 1990 charge. The second right to sue letter was issued on September 16, 1996. This litigation was filed within 90 days of the receipt of the second right to sue letter.

■■■ Even assuming that Harris's claim of disparate treatment in connection with the 1989 IA investigation is not time-barred, summary judgment is appropriate on the merits. Harris has not offered any evidence that a similarly situated non-African American officer was treated more favorably (or less harshly) than was Harris in connection with such investigations. Nor has Harris offered evidence that the investigation was based on race. To the contrary, both the fact of Harris's friendship with the other officer, as well as that officer's involvement in drug trafficking, are established in the record. Accordingly, under either a distinct loss or hostile environment theory of disparate treatment, Harris's count I claim fails as a matter of law.

■■■ Settle and Harris also seem to allege a disparate treatment claim based on Sgt. Earp's attempts in 1993 to monitor their police cruiser's movements using the AVL, contrary to Department policy that the AVL be used only in emergencies. I must reject this attempt to craft a disparate treatment claim out of these facts. This type of mediate step is not actionable under the disparate treatment prong of Title VII. Had Sgt. Earp used the information he gained through the AVL monitoring to demote, discipline or otherwise alter the employment conditions of African American officers in a way that he did *not* for white officers, then the adverse action (demotion, discipline, alteration of con-

ditions) perhaps would be actionable and the AVL monitoring of only African Americans would be evidence useful to sustain a disparate treatment claim.

▪ To the extent that Settle and Harris allege that they were subjected to disparate treatment with respect to their performance appraisals, these claims are likewise mediate and interlocutory and fail for the same reasons. Moreover, Title VII erects no barrier to the use of subjective evaluation measures. "[A]bsent evidence of retaliatory motive, we leave to the employer's discretion the method of evaluating an employee's job performance." *Beall v. Abbott Laboratories,* 130 F.3d 614, 620 (4th Cir.1997).

### 1. Discipline and Disciplinary Investigations

#### a. *Settle*

Settle has established a prima facie case of disparate discipline with respect to IA 93–308, the complaint in which he and McLaughlin, a white officer, were charged with violation of the same regulation in connection with their failure to investigate fully separate traffic accidents involving the same motorist on the same day in 1993. As stated above, "formal counseling by supervisors" was imposed on McLaughlin, the white officer, while "one (1) day loss of leave" was imposed on Settle, the African American officer. Thus, the conduct was of comparable seriousness and the disciplinary measure enforced against Settle was more severe than that enforced against McLaughlin.

▪ The asserted legitimate, non-discriminatory reason offered by the Department for the imposition of the harsher penalty on Settle was that he "was the more experienced officer and he had committed a more serious transgression." Indeed, the recommendation section of the Trial Board Summary emphasized that Settle "failed to perform the basic inquiries of an experienced traffic investigator. Officer Settle has 9 years of service, of which the last 3 years have been in the Traffic Division."

Confronted with this legitimate, non-discriminatory reason for the disparity of penalty, Settle has brought forward no evidence to show that the reason proffered by the Department was a pretext for a true discriminatory reason. Accordingly, defendants are entitled to summary judgment on Settle's claim of disparate discipline in connection with the suspected drunken driver incident.

#### b. *Harris*

Harris contrasts the prosecution of the charge arising from the August 1993, incident in which he was alleged to have failed to assist a security guard at the Liberty Court shopping center with the apprehension of a shoplifter (as to which Harris ultimately was acquitted) with two incidents involving white officers: (1) the August 1993 actions of Officer Lally and Franzoni concerning Lally's departure from the scene of a traffic accident involving personal injury, for which neither of them was investigated or disciplined, and (2) the alleged failure in November 1996, of a white officer to investigate a shoplifting incident and Franzoni's failure to investigate fully the incident and alleged effort to divert the investigation from the white officer.

▪ As a matter of law, however, the prosecution of Harris is not an adverse employment action because it was based on articulable facts and did not alter Harris's terms and conditions of employment. *See supra* p. 30–34. Moreover, even if the process of a trial board without more constitutes an adverse employment action, neither of the above incidents provides a basis for the conclusion that Harris has established a prima facie case of disparate treatment or, even if so, that a reasonable fact finder could rationally conclude that any difference in disciplinary proceedings was based on race.

Harris alleges that on August 28, 1993, Officer Lally was ordered by Franzoni to leave the scene of a traffic accident involving personal injury and property damage to continue an unrelated investigation into an alleged assault by an off-duty Department officer. Neither Franzoni nor Lally was disciplined for this incident.

The record reveals an almost comical dispute of fact over this incident but, even if there is, it is not material. Harris alleges that Lally left the scene on Franzoni's or-

ders. Harris's support for this contention is that on March 18, 1994, Franzoni allegedly admitted that he was the supervisor who told Lally to leave the scene of an emergency. Harris documented this statement on March 19, 1994. Harris also offers as support an affidavit from Settle in which Settle states that he was on duty and on the same radio frequency as Lally and Franzoni on August 28, 1993, the day of the incident. Settle states that he did not hear the emergency "signal 13" ("officer in need of immediate assistance") call which Lally claimed originally took him away from the traffic accident, but he did hear Franzoni tell Lally to leave the scene of the accident.

Defendants undertake to explain that Franzoni did not "order" Lally from the accident scene. Their account of the incident is that Lally was involved with Franzoni in an investigation of an alleged assault by an off-duty Baltimore County police officer and had been on his way to the alleged victim's home when the traffic accident was broadcast over the radio. Lally stopped at the accident because he was nearby and no one else was available. In the meantime, Lally left the scene of the accident to go to a nearby tavern when he received a "signal 13" from an officer who was involved in a physical confrontation with a patron in the tavern. After Lally had resolved the "signal 13" call, which apparently was something of a "false alarm," Franzoni told the *dispatcher* that Lally "was involved in a very serious investigation, [and] that she would have to find somebody else to handle that traffic accident." Another officer *responded to the traffic accident.*

It is somewhat unclear, then, whether Harris is arguing that Lally "left the scene" to go to the tavern or that he "left the scene" to continue with the assault investigation. Also unclear is whether Lally left to continue the assault investigation on his own or whether he overheard Franzoni's plea to the dispatch-

er that someone else should respond to the accident and thereby, understood that Franzoni *intended* that he leave the scene.

 In any event, Harris does not state a prima facie case with respect to this allegation because the prohibited conduct in which Harris allegedly engaged was not comparable in seriousness to the "misconduct" of Officer Lally. In fact, although Officer Lally left the scene of an accident, according to Harris's account, he did so on the command of Sgt. Franzoni. Thus, he did not engage in any "misconduct" whatsoever. Reasonable minds could not disagree that Franzoni, as the officer in charge, acted within his authority even if he ordered Lally to proceed with the assault investigation. Thus, the Lally incident is not probative of Franzoni's racial animus in submitting the report which lead to the prosecution of Harris for alleged neglect of duty in 1993.

Harris argues that he has presented a comparable incident involving the failure of a white officer, Patterson, to pursue a suspect he had reason to believe had shoplifted items from Staples in November 1996.[8] He argues that because Franzoni did not vigorously pursue this incident for the purpose of imposing discipline upon the white officer, and in fact, according to Harris, diverted the investigation, he has stated a prima facie case of disparate treatment. I disagree for several reasons.

The record contains no independent evidence of the facts surrounding this alleged incident. It should be recalled that by the time of the incident, plaintiffs had been reassigned from Western Traffic (in May 1996) and Harris was a patrol officer, but still in Franzoni's chain of command. On July 29, 1997, Harris documented his observations regarding the incident in a 12L. Harris wrote that on November 30, 1996, he received a call

8. Defendants argue that I should not consider the facts related to the Patterson incident because they are not alleged in the Harris's third amended complaint, and because Harris did not file an EEOC charge including the Patterson incident. I note that Harris only learned that Patterson would not be disciplined on January 10, 1997, seven days before he filed his third amended complaint, but, in any event, Harris is

not required to plead evidence. As is made clear in text, however, the probative value of the Patterson episode is insufficient to support a reasonable inference that African American officers in general, or Harris in particular, were subjected to disparate treatment in the investigation and prosecution of suspected wrongdoing or neglect of duty.

of a theft at a Tuesday Morning retail store. When Harris arrived, he heard an Officer Patterson state on the radio that he had been told "that some telephones were taken from the [nearby] Staples store." A citizen entered the Tuesday Morning store and advised Harris that another theft had occurred at the Staples store. Harris asked the dispatcher if the descriptions of the Staples and Tuesday Morning thieves matched. The dispatcher advised that she never received a call about the Staples store. Harris advised the dispatcher that Patterson had mentioned the telephones stolen from Staples over the police radio. When Harris concluded his investigation at Tuesday Morning, he went to Staples and spoke with the manager. The manager indicated that he had pointed out the suspect to an officer (Harris insists this was Patterson) and told the officer about the stolen phones. Harris reported Patterson's failure to pursue an investigation to Franzoni and suggested that Franzoni order the tape of the radio transmissions, which according to Harris would reflect Patterson's communication about the Staples theft.

In January 1997, Harris learned that Patterson would not be disciplined, in part, at least, because Franzoni could not conclusively determine the identity of the officer who spoke with the Staples manager. Franzoni had attempted to identify the officer by asking the Staples manager to select the photo of the officer from an array of all the white officers at the precinct, but the manager had chosen the photograph of an officer who was not working at the time of the incident. On the basis of this "evidence," Harris contends that "Lt. Franzoni deliberately diverted the investigation so that he would not have to bring charges against Off. D. Patterson."

I conclude that Harris has failed to state a prima facie case of disparate pursuit of investigations with respect to the Patterson incident. "[I]solated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees." Houck, 10 F.3d at 206–07(emphasis added). This after-the-fact incident is hardly substantial evidence that when Harris was disciplined for an alleged neglect of duty for behavior occurring in August 1993, the discipline imposed upon him was motivated by racial animus. Recall also that Franzoni (who was then a corporal) simply reported the alleged facts in connection with the 1993 incident; Harris's attempt to show that Franzoni was the disciplining officer is not borne out by the record.

Moreover, even if Harris has established a prima facie case, as a matter of law, the defendants have offered a legitimate, non-discriminatory reason for the differences in the treatment of Harris's and Patterson's situations, namely, the failure of the Staples manager to identify Patterson as the officer who failed to perform his duty. Moreover, Harris has not produced evidence sufficient to permit a rational finding that the Patterson incident in 1996 provides proof that in 1993, Franzoni acted with a racially discriminatory intent when he played a role in the prosecution of Harris in 1993. Harris's implied assertion that in 1996 Franzoni should have accepted Harris's version of the event at face value and that the information he provided was sufficient to justify instituting disciplinary proceedings against Patterson is misguided and unrealistic under the circumstances of this case. Harris had been "at war" with his supervisors for more than three years and had been removed from Western Traffic for the good of the unit. See infra pp. 1006–08. Accordingly, Harris's claim of disparate investigations (as a subspecies of disparate discipline) fails as a matter of law, because, even assuming he can establish an adverse employment action, he has failed to establish a factual basis supporting an inference of unlawful discrimination.[9]

c. Settle and Harris

Settle and Harris allege that they were subjected to a disparate level of investigation (and prosecution) in connection with the charges arising from the report of their

9. Harris also mentions in passing an alleged incident involving a white officer identified as Goldsmith. This allegation is not developed and will not be further considered.

failure to respond to a bank robbery alert on May 2, 1995. Settle and Harris were charged with failure to perform duties. Thereafter, a police trial board was convened to hear the merits of the charge, and both officers were found not guilty. They offer for comparison the incident discussed above involving Lally leaving the scene of a traffic accident, and they contend that the allegation of a failure to respond to the bank robbery call is of comparable seriousness.

As a matter of law, there has been no adverse employment action because the disciplinary proceedings (no details of which appear in the record) were firmly based on articulable facts and had no demonstrable racial nexus beyond plaintiffs' subjective belief that there was a racial motivation for the action. Furthermore, even if the prosecution of the charges constituted an adverse employment action, the bank robbery incident is not of comparable seriousness with either the Lally incident or the Patterson incident. As discussed above, Lally engaged in no misconduct. The Patterson incident lacks substantial probative value for the reasons already indicated. Moreover, it is indisputable that the potential harm arising from a neglectful failure to pursue a shoplifting investigation is not remotely comparable to the potential harm to the victim and the public as that arising from a failure to respond to the alert of a recent bank robbery. Accordingly, summary judgment is warranted on these claims. *See Cook,* 988 F.2d at 511.

### 2. Training Opportunities

As quoted above, in *Page,* the Fourth Circuit recognized that decisions regarding "entry into training programs" could be a basis for a disparate treatment claim. Plaintiffs contend that their inability to gain training has had a substantial adverse effect on their careers. Despite their arguments, however, these claims fail as a matter of fact and law.

 It must ' be remembered that the plaintiffs' claims are not that they were affirmatively denied attendance or entry into any training program. Rather, they claim that they received *less information* about training opportunities than others received. Even if it is assumed, *arguendo,* however, that Settle and Harris, as members of a protected class, were performing their jobs satisfactorily and were subjected to adverse employment action by not being "informed" of training opportunities, they fail to state a prima facie case because they have not shown that similarly situated officers outside the class were treated more favorably, or any other circumstances sufficient to support a reasonable inference that a racially discriminatory motivation accounts for any differences in the dissemination of information about training opportunities.

Plaintiffs allege that on their squad, Sgt. Earp did not inform them of training opportunities in the way that he informed white officers. In support of this allegation, plaintiffs offer the unsworn statements of Officer John DeOms, given in connection with IA 93–A–107. DeOms stated that at the time of the interview (which is not established), he had been at Western Traffic for five years. He stated:

Callahan: Okay. Now, these schools that you attended, how did you come to, uh, know that the schools were offered and did you have to submit any kind of paperwork to go?

DeOms: No, I was just told I was being ... sent to class.

Callahan: Okay. Was this, uh, recent after your assignment ..

DeOms: Yes, ma'am.

Callahan: ... to Traffic? Okay. Have you since voluntarily picked any schools to go yourself?

DeOms: Uh, I've been out I..L.D. for about ten ... ten and a half months...

Callahan: Okay.

DeOms: ... on light duty.

DeOms went on to state officers "were usually selected ... it wasn't read at roll call that certain schools were available." Additional support for the allegation that Settle and Harris were not informed of training opportunities in the way that other officers were informed is found in the following deposition testimony given by Settle:

Q: Okay. Did you ask him, "Sergeant Earp, I'd like to be made aware of these training opportunities"?

A: Yes, I did.

Q: Okay. And what was his response to that?

A: He didn't make me aware of them.

Q: What was his response to that when you allegedly asked him?

A: I don't remember what his answer was to me when I asked him, but the bottom line is he did not make me aware of any training.

Settle Mem. Opp. Mot. Summ. J. at Ex. 3, p. 16. Settle also testified that he asked Sgt. Earp why the same people always go to training classes and Earp responded, "You worry about yourself." *Id.*

The testimony of Officer DeOms that announcements were not made a roll call stands in sharp contrast to that of the vast majority of officers interviewed in connection is IA 93–A–107 who averred that announcements of training opportunities were made at roll call. Furthermore, plaintiffs' claims of disparate dissemination of training opportunities are undercut by the testimony of other African American officers that they were informed of training opportunities at roll call and did not experience problems receiving training. For example, when Officer Victor Williams, an African American (although not an officer on Harris and Settle's shift), was asked "[d]id you find that it was a problem getting any training or attending any schools?" Williams responded to IA investigator Callahan, *"I'm probably one of the most trained people at Western Traffic. I didn't have a problem."* Moreover, Officer Robert Speed, an African American who was on the plaintiffs' shift, indicated in an affidavit that "all training opportunities were announced at roll call and published on the roll call board. I never had any problems obtaining training I desired while I was stationed at Western Traffic."

Settle's attempt to establish a prima facie case is also undercut by his conceded awareness of the availability of a training coordinator at Western District. Settle testified that when he started at Western Traffic in October 1991, Officer Vance was the training coordinator. Nevertheless, Settle conceded that he never went to the training coordinator to discuss training opportunities. Settle testified on deposition as follows:

Q: Was there such a thing as a training coordinator at Western Traffic?

A. I believe when I first got there it was Officer Vance, I believe.

Q. And what did you understand his role to be?

A. He pretty much worked as an administrative officer for the Lieutenant. He was like the administrative officer for the lieutenant, like I say.

Q. All right. In terms of the training, what was his function?

A. I don't know.

Q. Okay. Did you ever have the opportunity to go to him and discuss training?

A. No. I did not.

Defs'. Mem. Supp. Mot. Summ. J., Ex. F, at pp. 12–13. Settle further testified:

Q: Now, Did Sergeant Earp ever refuse to approve you for any training you requested?

A. That, I don't know.

*Id.* at p. 27.

Settle and Harris seem to suggest that I should infer from a 1993 training roster that similarly situated white officers were treated more favorably with respect to training opportunities. The roster at issue was printed by the Department in 1993 and reflected the names of all Western Traffic officers and their levels of training. Plaintiffs seem to insist that they are entitled to an inference of intentional race discrimination from the fact that the roster showed that "minority officers had minimal training, such as radar school, whereas white officers who had less seniority than some of the minority officers had several more classes than [African–American officers]." To the contrary, however, the roster, like the testimony of Williams and Speed, undercuts the claim of disparate training opportunities. Settle concedes on deposition that the training roster shows that some African American officers received the training that they requested. Settle Mem. Opp. Mot. Summ. J. at Ex. 3, p. 16. Indeed, the roster further shows that some African American officers had considerably more training than some white officers. Accordingly, Harris and Settle have not stated a

prima facie case of disparate advice of training opportunities.

Settle argues that "whether or not training information was reaching the black officers obviously was a real concern for the Department because shortly after Lt. Foxwell arrived in Western Traffic she changed the procedures for announcing training opportunities. Her new process required that officers certify, by initialing a sheet, that they were notified of upcoming training sessions they could attend." Defendants respond that "[t]he reason Foxwell instituted this policy . . . is so officers like [plaintiffs] would not be able to claim, after the fact, that they had not been informed, as they are now trying to do in this litigation." Settle's contention in this regard is seriously flawed. *See Gibson*, 160 F.3d at 182 (" '*Post hoc propter ergo hoc* is not enough to support a finding of [discriminatory dissemination of training availability]' ")(quoting *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir.1998)).

Harris also offers as support on this claim the statements of Officer Raymond Ott, given in connection with the investigation of IA 93–A–107. Harris offers this testimony to show that prior to Foxwell's new procedure, it was rare that training information was given at roll call. Ott testified as follows:

> Callahan: Okay. Which schools have you attended?
>
> Ott: I've been through level one A.I., vascar, radar, taken on the . . . the seminars they've had and motorcycle training, anything they make available that I find out about I try . . . try to take it.
>
> Callahan: How do you come to know that the schools are coming up?
>
> Ott: Asking around mostly. Sometimes they post 'em on roll call . . . .
>
> Callahan: Um-hum.
>
> Ott.: . . . but that's . . . that doesn't happen too often. It's happenin' more now that Lieutenant Foxwell's in charge.
>
> Callahan: Um-hum.
>
> Ott: But it used to be, uh, real tough. There for about the first three years or a little more that I was in Traffic you didn't hear about 'em.
>
> Callahan: Um-hum.

> Ott: The people in Admin. heard about 'em, they signed up for 'em, they went. Uh, it was a selected few that found out about 'em.

Harris Mem. Opp. to Mot. Summ. J. at Ex. 22, p. 3. Although Harris offers this evidence to show that training opportunities were not routinely posted until Lt. Foxwell came to Western Traffic, it actually suggests that personal favoritism, not race discrimination, was the reason behind the disparate notification of training opportunities.

Here as with others of their claims, plaintiffs seem to rest on the unarticulated premise that because they are African American, and because they subjectively perceive that defendants have inflicted employment injuries upon them, they have satisfied the requirements of a prima facie case. This will not do. The overwhelming evidence in this record that other African American officers received the full measure of benefits and privileges in connection with the terms and conditions of employment as officers assigned to Western Traffic affirmatively undermines the inference that plaintiffs were the victims of intentional racial discrimination. Accordingly, defendants are entitled to summary judgment on these claims.

### 3. Scheduling Days Off

■ Defendants argue that "such a de minimus claim [as denial of preferred days off] is not even actionable under Title VII as it did not even truly impact the 'compensation, condition, or privileges' of [p]laintiffs' employment." I agree that it is very likely that the Fourth Circuit would view the scheduling of days off as beyond the scope of Title VII because the denial of preferred days off is almost certainly not an adverse employment action. Nevertheless, construing the scope of Title VII in the light most favorable to plaintiffs, I presume that scheduling matters potentially have more than a trivial impact on terms and conditions of employment.

Defendants contend that in order to establish a prima face case of this type of disparate treatment, a plaintiff would have to show: (1) that the plaintiff is a member of a protected class; (2) that similarly situated

black and white officers asked the same supervisor for the same schedule change at the same time; and (3) that only the white officers were granted the requested changes. I find defendants' proposed second element to be too narrow. It fails to address the principle stated by the Fourth Circuit with respect to comparable seriousness in the disparate discipline context that "... the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstance." *Cook,* 988 F.2d at 511.

The summary judgment record on the scheduling issue is chaotic, to say the least. As one might imagine, the entire issue of scheduling for a police department in a large metropolitan area is necessarily resolved by multiple criteria, including the intra-unit and intra-departmental seniority of specific officers, the need for flexibility depending upon time of day, day of the week and week of the month, and other factors, not least of all the preference of individual officers. The absence of a clear written policy on this issue has generated much controversy among the parties. What is not disputed, for certain, is that every officer enjoyed weekends off every other month.

In any event, Settle alleges that in May 1992, Sgt. Earp "took away" his permanent days off of Sundays and Mondays and gave him permanent days off of Wednesdays and Thursdays, but allowed Officer Gregory, a white officer, to retain his permanent days off of Sundays and Mondays.[10] It is assumed that Settle has established that he is a member of a protected class, he was performing his job satisfactorily and the denial of his requested schedule was an adverse employment action. Furthermore, he has established that Officer Gregory was similarly situated in that he was on the same shift and he

also had Sundays and Mondays off prior to Settle's schedule change. Furthermore, Settle established that Gregory was treated more favorably than Settle with respect to the schedule change.

Harris testified at deposition that Sgt. Earp gave less senior officers, Leichling and Isaac permanent days off "while at the same time den[ied his] request to have permanent days off."[11] Accordingly, Harris has established that he is a member of a protected class, he was performing his job satisfactorily and (arguendo) the denial of his requested schedule constituted an adverse employment action. Similarly, Harris has established that similarly situated employees outside of the protected class received more favorable treatment than he. Although the record does not disclose specifically the dates of Harris's, Leichling's or Isaac's requests for Thursdays and Fridays off, I recognize that the burden of establishing a prima facie case is not onerous.

Nevertheless, the plaintiffs' claims of disparate scheduling by Sgt. Earp based on race are undermined by the testimony of officer Charles Dunning, an African American officer on plaintiffs' shift. Dunning gave a statement in connection with IA 93-A-107 in which he indicated that he had no problems with scheduling. Dunning further testified that he found Sgt. Earp's accommodation of his scheduling requests (to allow him to take his elderly mother to regularly scheduled medical appointments) to be "commendable." Given that Sgt. Earp treated another African American on the same shift as Harris and Settle with exceptional fairness and accommodated his scheduling needs, Harris and Settle's prima facie case of disparate treatment in scheduling is fatally undercut. The inferential chain pointing to intentional racial discrimination is too weak to do the

---

**10.** Defendants argue that consideration of this May 1992 action is procedurally barred because in Settle's initial EEOC charge he listed the earliest date of any discrimination as March 1, 1993. Nevertheless, I will consider the May 1992 action with respect to Settle's claim of disparate scheduling.

**11.** Defendants argue that Harris has given conflicting testimony regarding the number of times he asked for certain days off: at his April 13,

1993, IA interview he stated that he asked Sgt. Earp once about switching his days off and that was shortly after he came to Western Traffic in 1990 and he did not raise the issue again with Sgt. Earp during the remaining three years he was under Sgt. Earp's supervision (Defs' Mem. in Supp. Mot. Summ. J. Harris at Ex. J., pp. 29–31); at his February 28, 1994, IA interview he stated that he had asked Sgt. Earp to change his schedule "at least a dozen times" (*Id.* at Ex. K, p. 11).

work the plaintiffs wish it to do. Accordingly, I shall grant summary judgment on this claim.

▇▇ Moreover, even if it is assumed that plaintiffs have projected a prima facie case, summary judgment on this claim should nevertheless be granted. Defendants responded to Settle's offering of a prima facie case by proffering that Gregory was allowed to keep his Sundays and Mondays off because he was senior to Settle. As further support for this contention, defendants offer an affidavit of Sgt. Adrian Hughes, supervisor and investigator in Internal Affairs, who stated that "nearly every officer interviewed [stated] that [scheduling] was handled fairly, and that conflicts over preferences in scheduling, when brought to the supervisor's attention, were settled based on seniority." Additionally, they offer (without objection from plaintiffs) a summary of the "Leave Discrimination" issue from IA 93–A–107 in which Sgt. Earp is quoted as saying "... Gary Gregory is the senior man so I gave him Sundays and Mondays." The summary also stated that the people who kept either Fridays and Saturdays or Sundays and Mondays as their permanent days off were the "senior people." This evidence constitutes legitimate, non-discriminatory reasons for the scheduling action taken.

As evidence of pretext, Settle offers Harris's situation. As discussed above, Harris also lost his permanent days off even though he had more seniority than two similarly situated white officers who retained their permanent days off. The fact that the defendants do not offer "seniority" as a "legitimate, non-discriminatory reason" for the schedule change in Harris's case arguably calls into question the validity of seniority as the true reason for the scheduling decisions in Settle's case which were made by Sgt. Earp. (Defendants insist, instead, that Harris effectively abandoned his quest for his preferred days off.). Nevertheless, Settle and Harris have not shown evidence that race discrimination was the true reason for the scheduling decisions and summary judgment would be appropriate.

## B. HOSTILE ENVIRONMENT CLAIMS

In support of his hostile work environment claim, Settle alleges that: (1) Sgt. Earp carried a "noose" through the Western Traffic office in the presence of Settle and other black officers on one occasion; (2) he was monitored on the AVL; (3) departmental procedures and policies were not followed (after his complaint of discrimination was filed with Internal Affairs, including the fact that Sgt. Earp was not removed as Settle's supervisor); (4) IA failed promptly and vigorously to investigate his claims of discrimination, and prompt and adequate remedial action was not taken after his complaint of discrimination was filed with IA; (5) Sgt. Earp and Capt. Hall repeatedly threatened to remove Settle from his "post car;"(6) his performance appraisals were lower than those of white officers; and (7) he was involuntarily transferred.

In support of his hostile environment claim, Harris alleges that: (1) a "noose" was present in the Western Traffic office; (2) he was monitored on the AVL; and, (3) his "post car" was damaged.

I recognize that "[t]he phrase 'terms, conditions or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment," *Harris*, 510 U.S. at 20, 114 S.Ct. 367. Nevertheless, many of Settle's allegations, even if true, bereft as they are of any racial nexus, would not substantiate a hostile environment claim. In other words, the content of the allegations is racially neutral, and there is no evidence in the record that the underlying acts and omissions were occurred because Settle is an African American. Only the allegations of the "noose," the AVL monitoring and the threatened removal from his post car are appropriate for consideration in this context.

Likewise, although Harris initially mentions that all of the allegations of the complaint support his hostile environment claim, Harris Mem. Opp. Mot. Summ. J. at 5, he appropriately focuses his discussion on only the "noose," AVL monitoring and removal from his post car. *Id.* at 27–33. Accordingly, I will address whether the evidence relating to these allegations, viewed in the light most favorable to the plaintiffs, sufficiently

supports their hostile environment claims so that summary judgment should be denied. I conclude that they do not.[12]

### 1. The "noose"

The device Harris and Settle label a "noose" was described by Settle on deposition in the following manner:

> [t]he object I saw at Western Traffic, it was a rope on the end, I guess, a broomstick-type of device made of wood, tape on the end where the rope would connect to the stick, knotted and made of rope with a circle opening large enough to find on the average person's head.

Defs' Mem. in Supp. Mot. Summ. J. at Ex. F, p. 145. Defendants do not dispute that there was a "broomstick with a loop of rope or bungee cord taped to the end of it ... present at some point in time at the Western Traffic office" or that the device was not "standard issue." Nor do they dispute the racial animus behind a "real noose." *Id.* However, whether the object described can reasonably be called a "noose" given Settle's description is problematic, at best.

Officers Settle, Floyd and Blackwell, all African American officers, told the IA investigator that they were offended by the racial symbolism of the "noose." However, Blackwell described the loop to IA as being a "bungee cord," and Floyd stated that, "initially, I didn't pay that much attention to it." Furthermore, African American officer Victor Williams stated that he was not in any way offended by the device. Williams remembers that when Settle said in the company of another black officer, "I think I should tell my supervisor that that's offending me," that "I thought they were joking ... maybe I was just being insensitive, but I thought they were joking." In light of this record, I will presume that a reasonable African American would have perceived the device, as described by Settle, as a racial symbol or threat.

The object was not subjectively hostile or abusive to anyone other than Settle and arguably Officer Blackwell. No one but Settle states that he ever saw Sgt. Earp possess the device. Indeed, despite Blackwell's indica-

tion that he showed the device to Harris, when asked during the IA investigation of 93–A–107 "[h]ad you seen it?" referring to the "noose," Harris responded "[n]o, I didn't." Harris also intimated in his deposition that he never saw the device. He testified:

> Q: Okay. You also then mention that Sergeant Earp was, quote, seen carrying a noose in the Western Traffic Office?
>
> A: Yes.
>
> Q: You never observed that did you?
>
> A: No, I did not. I was not at work that day, and that's per the affidavit by Calvin Settle.
>
> \* \* \* \* \* \*
>
> Q: Okay. But you wouldn't normally think of a broomstick with a piece of rope taped to it to be a noose, would you?
>
> A: Well, I think that Calvin knows what a noose is, and if he says it's a noose, that's pretty much what I say. And I think it's offensive to all blacks.

Thus, Harris cannot claim to be abused by something that he was never subjected to; Title VII does not recognize a "vicarious hostile environment" claim.

 Even assuming that a reasonable person would conclude that the device was a racially insensitive symbol, its display on one occasion (or for a brief time) will not sustain a hostile environment claim. Although some officers might reasonably find the device distasteful and offensive, the conduct relied on by Settle allegedly occurred only one time. The lack of frequency and the absence of any gesturing toward Settle or comments accompanying the possession of the "noose" by Sgt. Earp contribute to my conclusion that the conduct, taken as true, was not sufficiently severe or pervasive to alter the conditions of Settle's employment, and did not unreasonably interfere with his work performance. *See Faragher,* 524 U.S. at ——, 118 S.Ct. at 2283 (" '[D]iscourtesy or rudeness should not be confused with racial harassment' and ... 'a lack of racial sensitivity does not, alone, amount to actionable harassment' ")(quoting 1 B. Lindemann & P. Grossman, *Employ-*

---

12. Plaintiffs' "retaliatory harassment" claims are discussed *infra.*

*ment Discrimination Law* 349, and nn. 36–37 (3ed.1996)); *id.* at n. 1 ("[I]ncidents of environmental ... harassment 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive[.]' ") (citations omitted).

### 2. AVL Monitoring

 Defendants concede that use of the AVL in non-emergency situations violates internal Department regulations. However, they correctly note that this does not make the AVL monitoring a Title VII violation. *See Vaughan,* 145 F.3d at 203 (recognizing that violations of internal procedures do not constitute discriminatory intent). Furthermore, the AVL monitoring could not have created an objectively hostile work environment or subjectively hostile environment at the time it occurred because Settle and Harris were not even aware of the monitoring until some time later. Settle found out about the AVL monitoring by March 1993, but is not sure exactly when he became aware of it. Settle learned that he was being monitored on the AVL from one or more of the dispatchers. As Settle put it:

The way it was brought to my attention was that it was happenin' so often questions was asked to me, well, what've you done wrong and I said nothin' that I know of, 'cause the reason why I'm askin' you this is because you're continually bein' AV-Led.

Settle Mem. in Opp. Mot. Summ. J. at Ex. J, p. 3. Furthermore, there is no evidence that Settle, Harris or any other black officer was monitored on the AVL after March 1994.[13] Although Harris and Settle may be able to establish that the AVL monitoring was based on race because only African American offi-

cers were monitored on the AVL, AVL monitoring did not create a subjectively or objectively hostile work environment and did not have the requisite severity and pervasiveness to establish a hostile environment claims. *See Faragher,* 524 U.S. at ——, 118 S.Ct. at 2283.

### 3. Damage to Harris's "Post Car"

 Harris suggests that the damage to his post car is evidence of both hostile environment and retaliation. Harris claims that after he met with supervisors in March 1993 to discuss his concerns of racial discrimination and harassment, Officer Powell, a white officer who had been mentioned during the meeting as being "buddy-buddy to Sergeant Earp" but who was not present, approached Harris, stated "I heard you been running your mouth" and appeared confrontational. Harris simply walked past Powell. According to Harris, either the next day or soon thereafter, his post car was damaged. In fact, Harris does not know who damaged the car, and Harris has no evidence apart from his subjective belief that the damage to his car was based on race. Powell has not been deposed, and there is no evidence beyond Harris's speculation to connect this incident to his status or his complaints.[14] Accordingly, the damage to his "post car" does not support his claim of a cognizable racially hostile work *environment. Id.*

### 4. Threatened Removal of Settle from his "Post Car"

 Settle alleges that the threat to remove him from his post car constitutes evidence of racial harassment supporting both his hostile environment claim and his retalia-

---

**13.** By the dispatchers' accounts, requests for AVL were infrequent and some dispatchers denied the requests. Thus, actual "AVLing" was even more rare than the requests. Accordingly, the AVL monitoring was not severe and pervasive.

**14.** Nor can Harris establish a retaliation claim based on damage to his "post car." During Harris's April 1, 1993, interview with IA, he stated that he believed Powell had done the damage because Harris was assigned a newer patrol car and Powell got Harris's older car. Defs.' Mot. Summ. J. at Ex. J, p. 53–54. Furthermore,

on deposition, Harris disclaimed all allegations of retaliatory motive in connection with damage to his patrol car. He testified:

Q: Is it your testimony here today that you never alleged that this damage was deliberate retaliation for your complaints?

A: I know that it was done. If I could say for sure, I would tell you, but I don't know for sure.

Q: Didn't you made that allegation though, that this is what you believed?

A: I don't recall that, no.

Harris dep. at 186–87.

tion claim. This claim fails under either theory. Settle alleges "[o]n January 24, 1995, Sgt. Earp issued [me] a rating stating that [I] wrote too few speeding citations. At the time, [my] performance in terms of traffic enforcement met all existing Departmental benchmarks. At that time, Defendant Earp reiterated a threat previously made by Capt. Howard Hall to remove [me] from my post car for these alleged citation writing deficiencies. No white officers were issued warning or threatened with removal from their post car as [I] was for baseless allegations of this sort." Complaint at ¶ 26.

Settle provides no evidence that white officers were not issued warnings or threatened with removal from their post cars for the same reason. To the contrary, defendants submit four "Performance Observation Forms" indicating that white officers were warned about their low citation levels. Settle's bare allegations will not support either a hostile environment or disparate treatment claim based on warnings and threatened removal from his post car. Furthermore, Officer Isaac, a white officer, was removed from his post car in late 1994 because, "[h]is enforcement level was extremely low."

On deposition, Settle acknowledged that in addition to accident investigation, traffic enforcement was his primary area of responsibility. He also acknowledged that it was within his supervisors' authority to order the Western Traffic officers to maintain a ticket to warning ratio of at least fifty percent. The record shows that Capt. Hall stated in July 1994 and again in December 1994 that a high number of warnings versus citations would not be acceptable. This information was known to all officers. Furthermore, the record shows that on September 9, 1994, Lt. Foxwell issued a memorandum to all officers stating that "no more than 50% warnings would be acceptable." In August 1994, Cpl. Randy Brashears, an African American officer, gave Settle a performance observation form (as opposed to a "Performance Appraisal") which stated "as previously discussed, your speeding tickets to other citation ratio is extremely low and unacceptable. If this pattern continues it will be reflected in your ratings."

Prior to the threat of removal from his "post car," Settle had been counseled on several occasions that he needed to write more speeding tickets in order to comply with quotas established for all Western Traffic officers. Although Settle made a sufficient number of traffic stops, his citation to warning ratio was low. Settle's July 1994–December 1994 performance appraisal reflected that the number of speeding tickets issued by Settle was the lowest on the squad with 44. This was 107 lower than the next officer. Settle's reason for the low number of tickets was that he wanted to "make positive contacts with the public." Sgt. Earp wrote:

> In view of the fact that he has chosen to ignore all requests and orders to bring up the numbers, he will be marked "competent." Had he shown some effort to comply in just the last month or two, this would not have been necessary. He has been told by Captain Hall that failure to comply by the end of January will result in his being removed from his permanent post car. Hopefully this will not be necessary; especially since he already makes the stops, but just needs to follow the instructions given to him to turn some of the warnings into speeding citations.

Settle has not established that the threatened removal from his post car was based on race. Accordingly, the threatened removal from his post car does not support his hostile environment claim; defendants are entitled to summary judgment.

C. RETALIATION CLAIMS

1. Traditional Retaliation

Settle and Harris allege that their transfers from Western Traffic, a specialized unit, to the Woodlawn and Garrison precincts, respectively, which are general patrol precincts, constitutes retaliation. Additionally, Harris claims that removal from his post car was retaliatory. These claims do not survive summary judgment.

a. *Transfers From Western Traffic*

Settle and Harris allege that the April 2, 1996 transfer memorandum provides direct evidence that their transfers were retaliatory. To the contrary, the transfer memoran-

dum goes to considerable length to explain that the transfers of Harris, Settle and Floyd (another African American officer) was for legitimate non-retaliatory reasons and were indeed, based on the a reasonable determination that (as to Settle and Harris) transfer was necessary based on their non-protected actions. Specifically, the memorandum states:

Officers Harris and Settle have also become more hostile in their relations. They refuse to acknowledge the presence of their supervisors and some other officers. They have focused their allegations against Lieutenant Foxwell, claiming that she has committed "crimes" against them. After a recent IAS interview they were observed to stand in the hallway of Western Traffic, pointing at her office, publicly stating that she was responsible for their troubles. Officer Settle has also advised Corporal Richard Howard, that he intends to "take down" every supervisor in Western Traffic. Corporal Howard [an African–American officer] has requested a transfer because of the stress and pressure that this has placed on him. Corporal Karen Johnson has also advised Lieutenant Foxwell that she too feels that the environment is poor due to the actions of these officers.

Settle Mem. in Opp. Mot. Summ. J. at Ex. 2. The transfer memorandum goes on to state:

The officers at Western Traffic are also suffering from the environment created by Officers Harris and Settle. They have been interviewed repeatedly during investigations and have been deprived of the attention of their supervisors who are being consumed by these personnel issues. They are now questioning why this environment is being allowed to continue. The atmosphere and resulting rumors have made it very difficult to recruit qualified personnel into this Unit. As the commander of this division, Major Kelly was compelled to take action to improve this environment.

*Id.*

This explication hardly constitutes direct proof of a retaliatory motive; it proves the opposite. Thus, whether Harris and Settle can prove retaliation based on the transfer requires application of the burden-shifting analysis. Settle engaged in protected activity on March 2, 1993, when he filed an EEOC complaint; on March 25, 1993, when he expressed his concerns of race discrimination at a meeting with his supervisors; on March 26, 1993, when he filed an IA 93–A–107 alleging discrimination; on September 9, 1994, when he filed a second EEOC complaint; and on June 19, 1996, when he amended his second EEOC charge. Harris engaged in protected activity on March 9, 1994, when he filed an EEOC complaint; and on March 29, 1994, when he filed a 12L with IA alleging disparate treatment.

■ A prima facie case of retaliation based on their transfer hinges on whether their transfers were adverse employment action. Generally, mere transfer to another position, without loss of salary, benefits or rank does not constitute adverse employment action. However, a material change in duties can make a transfer adverse employment action. Neither Settle not Harris disputes that he held the same rank and received the same benefits and salary that they had at Western Traffic.

The record reveals that the duties of a traffic officer are defined as "[r]esponsib[ility] for enforcement of motor vehicle laws of the State of Maryland, traffic codes of Baltimore County, accident investigation, specialized and routine enforcement relating to vehicular and pedestrian traffic throughout the Community Services Division." As support for the proposition that a transfer to a general patrol unit from a traffic unit is a change in duties, plaintiffs offer the testimony of Brian Matthews, a one-time member of the Department's IA unit. Matthews' view is that specialized units, such as traffic, are an advantage "usually because you aren't doing the daily routine of handling the calls, going from call to call, even though the specialized units are busy in their own way, it's something different, it's something that you specialize in, and a lot of times you have better hours and things of that nature. You don't work all the different shifts."

Although plaintiffs have presented thin evidence that there is some marginal advantage

to being in a specialized unit, they have not established that the duties are materially different from the duties of a patrol officer In the absence of concrete evidence of how the material duties of the two jobs differed or how the "hours and things of that nature" changed to the detriment of Harris and Settle, I find, as a matter of law, that the transfer did not constitute adverse employment action.[15]

▮ Even if Settle and Harris had stated a prima facie case of retaliation, defendants have stated a legitimate, non-discriminatory reason for the transfer. As discussed above, defendants have proffered that other officers, including an African American officer, complained about the actions of plaintiffs and two of those other officers requested transfers or expressed genuine concern about the status of the morale and environment of Western Traffic. Several weeks before the decision was made to transfer the plaintiffs, Officer Howard, an African American, informed his supervisor that Settle stated that he intends to "take down" every supervisor at Western Traffic.

Defendants appropriately viewed these actions as beyond protected activity. As the court stated in *Olivares v. NASA*, 934 F.Supp. 698, 705 (D.Md.1996), "the fact that an employee may have filed an EEO claim gives him no license to vilify supervisors or co-workers or indeed to make every response of theirs to such vilification the basis of a claim of retaliation." In response to this showing, plaintiffs have not come forward with evidence to show that these reasons were a pretext for a true retaliatory reason. Accordingly, the plaintiffs have not stated a claim of retaliation based on their transfers.

### b. *Removal of Harris from His "Post Car"*

Harris alleges that his removal from his "post car" by Franzoni on April 12, 1994, and Harris's negative performance evaluation constitute actionable retaliation. Defendants concede that Harris engaged in protected activity when he filed his EEOC charge on March 9, 1994 and his internal complaint on March 19, 1994. They also concede, for purposes of summary judgment, that the removal from the "post car" was adverse employment action. Because the removal from his "post car" occurred close in time to the protected activity, Harris has stated a prima facie case of retaliation.[16] Accordingly, I find that Harris has stated a prima facie case of retaliation based on removal from his "post car."

▮ However, defendants have stated legitimate, non-discriminatory reasons for Harris's removal from his "post car." Franzoni stated that he removed Harris from his "post car" because he made "inappropriate comments on the police radio that would indicate to me that he was less than a team player." These comments led Franzoni to look at Harris's past performance appraisals, completed prior to the commencement of Franzoni's supervision of Harris, to determine whether Harris was willing to handle calls outside of his "post" area, which was the subject of Franzoni's original concern. After doing so, Franzoni determined that "there was a clear indication that there was a track record of this behavior, and [such] behavior was negative on the Western Traffic Division." Franzoni's observations regarding Harris's recent and more historical behavior were documented by Franzoni in a "performance observation form" completed on April 12, 1994.

---

15. Settle's view is that the transfer was a demotion. He states, "[i]f you check the hierarchy at the police department, patrol is at the rock bottom, whereas even it its a patrol specialized unit, such as Traffic, such as Canine, we are above patrol." Settle Mem. Opp. to Mot. Summ. J. at Ex. 3, p. 289. Settle also refers to an Organizational Flowchart for the Department which he alleges supports this contention that patrol is "rock bottom." *Id.* at Ex. 46. To the contrary, however, the chart shows that both "Operations Management" (the most analogous term to the narrative description of "Operational Support Services Section," which encompasses Western Traffic) and "Community Services Division" (which encompasses the 12 patrol precincts) fall under the heading "Operations Bureau." The chart does not indicate that one is "above," or higher in the hierarchy of the Department, the other.

16. Defendants dispute that there was a causal connection between the protected activity and the adverse action because Franzoni was not aware of the EEOC charge until 1996.

Thereafter, Franzoni "made a decision to put an officer in his permanent post car that was more of a team player." Franzoni testified that he regarded the officer placed in the car as more of a team player because "[h]e backed up other officers without being asked to do so. He handled criminal cases as well as traffic cases. He was probably, in fact, the best officer, I felt, at that time in that station."

Harris has not shown that the reasons offered by defendants are a pretext for a true retaliatory motive. He concedes that squad supervisors have the discretion to assign "post cars." He responds that pretext should be drawn from the fact that he was evaluated by Franzoni after only three months under his supervision, rather then the normal six months. However, "performance appraisals" are done every six months while "performance observations" can be done at any time to document trends or events. Furthermore, in late 1994, Franzoni removed Officer Isaac, a white officer who had no discrimination complaints pending, from his "post car" because of his extremely low enforcement level. This further undercuts Harris's claim that he was removed from his "post car" in retaliation for protected activity. Thus, Harris offers nothing more than mere timing to support his claim that the removal from his "post car" was retaliatory. Mere timing will not avoid summary judgment on his claim that the true reason for the removal from the car was retaliation for protected activity.

c. *Intensity of Disciplinary Investigations*

██ Settle alleges that Lt. Foxwell's pursuit of IA investigations against him, 93–308 (two accidents, McLaughlin also investigated) and 95–184 (failure to respond to bank robbery), were vigorous, in contrast to the IA investigation of Settle's claim of discrimination against the Department, and that this "vigorous pursuit" is evidence of a racially hostile environment and retaliation.

The facts surrounding the underlying incidents were discussed above. I set forth here the procedural facts relating to the Department's disciplinary process. When a complaint is made, the Commander of IA may decide to have IA investigate the matter or may assign the complaint to the officer's commander for a "command level" investigation. In these cases, Lt. Foxwell was Settle's commander. In her affidavit, she states that complaint 93–308 was forwarded to IA because the complaining "citizen insisted that the complaint be formally investigated." She forwarded complaint 95–184 to IA because of "the serious nature of this allegation."

As is indicated above in the discussion of these and related claims under a "discrete act" rubric, Settle's mere citation of the basic fact of investigations does not establish a case of hostile work environment or retaliation. Each of the investigations (and resulting disciplinary proceedings) grew out of factually supported reports of neglect of duty. Undoubtedly, like any officer made the subject of a disciplinary investigation, Settle found the experiences emotionally wrenching. Nevertheless, as stated *supra*, supervision does not equate to a hostile environment and the record is devoid of evidence that Foxwell acted out of a retaliatory motive. Accordingly, defendants are entitled to summary judgment as to these claims.

2. Retaliatory Harassment

Together, Settle and Harris suggest, without significant elaboration, other forms of alleged retaliation, including: (1) pursuit of baseless investigations and disciplinary actions; (2) lowered performance ratings; (3) use of an "armed" escort to effect their physical removal on the day of their transfer from Western Traffic; and, (4) use of the "assignment completed" code, "10–24" to secure the Western Traffic offices after they were reassigned.

Even if plaintiffs could establish a prima facie case of "retaliatory harassment" based on pursuit of investigations and disciplinary actions against him, defendants have offered legitimate, non-discriminatory reasons for the actions. Settle has not come forward with evidence to establish that the proffered reason was a pretext for a true discriminatory one.

██ Lowering performance ratings is not adverse employment action. "There is little support for the argument that negative performance evaluations alone can constitute

an adverse employment action." *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996). Rather, it is a mediate step, which, if relied upon for a true adverse employment action (e.g., discharge, demotion, etc.,) becomes relevant evidence. "[A]bsent evidence of retaliatory motive, we leave to the employer's discretion the method of evaluating an employee's job performance." *Beall v. Abbott Laboratories*, 130 F.3d 614, 620 (4th Cir.1997). As a matter of law, neither the use of an armed escort to usher Settle and Harris from Western Traffic nor the use of the "10–24" code gives rise to a cognizable claim of "retaliatory harassment."

## VI. CONCLUSION

For the reasons set forth herein, the defendants' motions for summary judgment shall be granted. An order follows.

### ORDER

For the reasons stated in the accompanying memorandum, it is this 20th day of January, 1999, by the United States District Court for the District of Maryland, ORDERED

(1) That defendants' motion for summary judgment is GRANTED;

(2) That JUDGMENT IS ENTERED IN FAVOR OF DEFENDANTS;

(3) That the Clerk of the Court CLOSE THIS CASE and TRANSMIT a copy of this Order and the foregoing Opinion to counsel of record.